**BOROUGH OF LANSDALE, Borough of Blakely Borough of Catawissa, Borough of Duncannon, Borough of Hatfield, Borough of Kutztown, Borough of Lehighton, Borough of Mifflinburg, Borough of Olyphant, Borough of Quakertown, Borough of Schuylkill Haven, Borough of St. Clair, Borough of Watsontown, Borough F Weatherly, Pennsylvania Plaintiffs,**

v.

**PP & L, INC., PPL Electric Utilities Corp., PPL Energy Plus, L.L.C., and PPL Generation, L.L.C., Defendants.**

No. Civ.A. 02–8012.

United States District Court,
E.D. Pennsylvania.

April 5, 2006.

---

C.J. Mustacchio, Scranton, PA, Charles F. Wheatley, Jr., John F. Woods, Wheatley & Ranquist P.A., Annapolis, MD, Jonathan B. Young, Dischell Bartle Yanoff & Dooley, Lansdale, PA, for Plaintiffs.

Christopher D. Oatway, David L. Meyer, Edward H. Rippey, James R. Atwood, Covington & Burling, Washington, DC, John G. Harkins, Jr., Karin E. Davis, Steven A. Reed, Harkins Cunningham, Philadelphia, PA, Charles F. Wheatley, Jr., Wheatley & Ranquist PA, Annapolis, MD, for Defendants.

### MEMORANDUM and ORDER

YOHN, District Judge.

The Boroughs of Lansdale, Blakely, Catawissa, Duncannon, Hatfield, Kutztown, Leighton, Mifflinburg, Olyphant, Quakertown, Schuylkill Haven, St. Clair, Watsontown, and Weatherly, Pennsylvania ("the Boroughs") bring this action against PP & L, Inc., PPL Electric Utili-

ties Corp., PPL Energy Plus, L.L.C., and PPL Generation, L.L.C. (collectively, "PPL") alleging various antitrust violations and asserting a claim for breach of contracts approved by the Federal Energy Regulatory Commission ("FERC").[1] Compl. ¶¶ 14–19, 20–22. Defendants assert counterclaims for breach of contract as to all plaintiffs, Counterclaims ¶¶ 19–24 and tortious interference with existing and ongoing contractual relations as to Olyphant, Counterclaims ¶¶ 25–36. Currently pending before the court is defendants' motion for summary judgment on all counts of plaintiffs' complaint.

For the reasons set forth below, defendants' motion for summary judgment will be granted almost in its entirety. More specifically, I will grant defendants' motion for summary judgment on plaintiffs' claims for violation of § 1 of the Sherman Act, § 2 of the Sherman Act, and § 2 of the Clayton Act, as well as plaintiffs' claim for breach of contract regarding retail stranded costs. I will grant defendants' motion for summary judgment on plaintiffs' breach of contract claim regarding firm power requirements as to the Boroughs of Lansdale, Blakely, Duncannon, Hatfield, Kutztown, Lehighton, Mifflinburg, Olyphant, Quakertown, Schuylkill Haven, St. Clair, Watsontown, and Weatherly. However, defendants' motion for summary judgment on plaintiffs' breach of contract claim regarding firm power requirements will be denied as to the Borough of Catawissa. I will also grant defendants' motion for summary judgment on all claims raised by the Borough of Olyphant and previously litigated to a conclusion in *Borough of Olyphant v. PP & L Inc., et al*, Civ. No. 03–4023, 2004 WL 1091037, at *1, 2004 U.S. Dist. LEXIS 8958, at *1 (E.D.Pa. May 14, 2004) *aff'd Borough of Olyphant v. PPL Corp.*, 153 Fed.Appx. 80 (3d Cir. 2005).

## BACKGROUND

This case involves the electric power industry in Pennsylvania. This industry is partially regulated by the Federal Energy Regulatory Commission ("FERC"), partially regulated by the Pennsylvania Public Utility Commission ("PUC"), and partially unregulated. In general, FERC regulates the sale of wholesale power and its transmission in interstate commerce and the

1. Almost identical claims to the ones asserted in the present case were also asserted by the Borough of Olyphant, as an individual plaintiff, in *Borough of Olyphant v. PP & L Inc., et al*, Civ. No. 03–4023, 2004 WL 1091037, at *1, 2004 U.S. Dist. LEXIS 8958, at *1 (E.D.Pa. May 14, 2004). This court denied a motion made by Olyphant, and the boroughs that are parties to this action, including Olyphant, to consolidate the cases, because discovery in the Olyphant case had been closed for nearly a year, while fact discovery in this action had just begun. This court granted summary judgment dismissing Olyphant's breach of contract claims, Sherman Act § 1 claim, and Clayton Act § 2 claim. *Id.* This court also dismissed Olyphant's Sherman Act § 2 claim without prejudice to Olyphant's ability to pursue the claim in the case at bar. *Id.*

On September 27, 2005, the Third Circuit affirmed this court's decision in *Borough of Olyphant*:

Olyphant also argues that the district court erred in granting summary judgment dismissing its breach of contract claim and its claims under Sections 1 and 2 of the Sherman Act and Section 2 of the Clayton Act, denying its motion for summary judgment with respect to PPL's counterclaims, and granting summary judgment in favor of PPL with respect to PPL's counterclaim for breach of the dispute resolution clause.... We have carefully considered Olyphant's arguments on this appeal and find that they lack merit. For the reasons stated in the District Court's well-reasoned and thorough opinion, we find that summary judgment was properly granted.

*Borough of Olyphant v. PPL Corp.*, 153 Fed. Appx. 80, 82–83 (3d Cir.2005).

PUC regulates the sale of retail power in Pennsylvania and its distribution to the ultimate consumer. The two regulatory regimes are considered simultaneously in this case, primarily because the Boroughs purchased wholesale power from PPL for resale to their retail customers and also competed with PPL for the sale of retail power to other potential retail customers. It is important, however, to understand the basics of how each regime works independently in order to understand how the two interact in the instant case.

## I. The PUC and Retail Power in Pennsylvania

Historically, electric utilities in Pennsylvania provided three services to customers: the generation, transmission and distribution of electricity. *PP & L Industrial Customer Alliance v. Pennsylvania Public Utility Comm'n,* 780 A.2d 773 (Pa.Cmwlth. 2001). These services were bundled together and performed by one local utility, which held a monopoly over its service area. *Id.* Effective January 1, 1997, Pennsylvania adopted the Electricity Generation Customer Choice and Competition Act ("Competition Act"), 66 PA. CONS.STAT. §§ 2801 *et seq.,* which effectively deregulated the business of generating electricity in Pennsylvania and unbundled the three services. Consumers can now choose to purchase their generation service from electric generation suppliers ("EGS"), other than the local utility previously granted an exclusive franchise. The other two services, transmission and distribution, were not deregulated by the Competition Act. The local utility still remains solely responsible for the transmission and distribution of the electricity.

If consumers do not or cannot choose an alternative EGS, a local utility is also re-

quired to provide electricity to them as the "provider of last resort" ("POLR") at a capped price. 66 PA. CONS.STAT. §§ 2802(16) and 2807(e)(3) ("if a customer does not choose an alternative electric generation supplier, the electric distribution company ... shall acquire electric energy at prevailing market prices to serve that customer and shall recover fully all reasonable costs.") Those consumers who do choose another EGS continue to pay their local utility for transmission and distribution services, plus a separate charge for the generation service, reflecting the market rate (usually lower than the local utility rate), to the EGS of their choice.

The Pennsylvania Legislature recognized that certain costs incurred by local utilities while they were monopolies (and the electricity market was completely regulated) would not be recoverable in a competitive market. *See* 66 PA. CONS.STAT. § 2803. These are referred to as "stranded costs." The General Assembly created the competitive transition cost ("CTC"), 66 PA. CONS.STAT. § 2808, which would be paid by retail consumers to their local utility (the former monopoly in the area) to reimburse it for the stranded costs. The Competition Act required each Pennsylvania electric utility to file a "restructuring" plan with the PUC, which would explain how the utility expected to comply with the new mandates of the Competition Act. 66 PA. CONS.STAT. § 2806(d). In addition to reviewing all of the restructuring plans, the Competition Act also assigned to the PUC the responsibility of holding a public proceeding to determine each utility's retail stranded costs.[2]

In summary, rates changed under the Competition Act from a single "bundled" rate for combined services, to "unbundled"

---

2. The stranded costs allocated to *retail distribution* lines are regulated by the PUC. As will

be seen, stranded costs allocated to *wholesale transmission* lines are regulated by the FERC.

rates consisting of three major components: (1) a charge for generation services—that is, electric power supply, either from an EGS or the local utility; (2) charges for transmission and distribution services; and (3) the CTC, for recovery of stranded costs.

## II. FERC and Wholesale Power in Pennsylvania

In 1935, Congress enacted the Federal Power Act ("FPA"), 16 U.S.C. §§ 791a–828c, which established the Federal Power Commission, the predecessor of FERC, "to oversee the wholesale transmission and sale of interstate electric power." 49 Stat. 838 (1935) (codified as amended at 16 U.S.C. §§ 791a–825r).[3] Since 1935 there have been numerous technological advances which have made it possible to generate electricity more efficiently and to share energy over large regional networks. "It is now possible for power companies to transmit electric energy over long distances at low cost." *New York v. FERC*, 535 U.S. 1, 8, 122 S.Ct. 1012, 152 L.Ed.2d 47 (2002)

In 1996, FERC recognized the ease of transferring substantial amounts of electricity from region to region, and issued Order No. 888 in an effort to structure an orderly transition to competitive bulk power markets. *New York v. FERC*, 535 U.S. at 11, 122 S.Ct. 1012 (interpreting Order No. 888, 75 FERC ¶ 61,080). The portion of Order No. 888 relevant to the instant case is that it required, like the Pennsylvania Competition Act to follow, the unbundling of generation services from transmission and distribution services. As the Supreme Court explained this provision, the unbundling "requir[ed] each utility to state separate rates for its wholesale generation, transmission, and ancillary services, and to take transmission of its own

wholesale sales and purchases under a single general tariff applicable equally to itself and to others." *Id.* This effectively opened the market for competition among energy wholesalers because a consumer could now purchase energy from an alternative supplier and have that energy transmitted over the network already in place. Like Pennsylvania's Competition Act, it permitted the previously monopolistic wholesalers to recover reasonable wholesale stranded costs incurred because of the increased competition for generation services.

In order to regulate the price of wholesale power, FERC traditionally required "every public utility [to] file with the Commission ... schedules showing all rates and charges for any transmission or sale subject to the jurisdiction of the Commission," 16 U.S.C. § 824d (c), i.e. the "transmission of electric energy in interstate commerce" and "sale of electric energy at wholesale in interstate commerce." 16 U.S.C. § 824(b). However:

> [m]ore recently, in the case of wholesale electricity, FERC has moved to a rate-based market mechanism for pricing electricity. In other words, rates are determined based upon the price obtained when electricity is traded on the market. These rates paid by wholesale buyers remain subject to FERC jurisdiction and review. While utilities do not necessarily file specific rates with FERC prior to selling energy, they sell pursuant to the terms, conditions and formulas established by FERC's regional wholesale electricity rules. FERC approves those rules in advance of authorizing the wholesale electricity markets to operate.

*Utilimax.com, Inc. v. PPL Energy Plus, LLC*, 273 F.Supp.2d 573, 575–76 (E.D.Pa.

---

**3.** In 1997, Congress reorganized the Federal Power Commission as FERC.

2003). In the instant case, the relevant regional wholesale electricity market established by the FERC is the PJM Interconnection ("PJM"), which covers energy sales in all or parts of Delaware, Illinois, Indiana, Kentucky, Maryland, Michigan, New Jersey, North Carolina, Ohio, Pennsylvania, Tennessee, Virginia, West Virginia and the District of Columbia. Overview of PJM Interconnection, *available at http://www.pjm.com/about/glance.html* (last visited Apr. 4, 2006). "Pursuant to rules approved by FERC and subject to FERC's on-going regulation of wholesale electricity markets, PJM coordinates the continuous buying, selling, and delivery of wholesale electricity through various auction markets designed to match supply with demand." *Id.* at 576. Many wholesale customers purchase the energy they ultimately resell at retail to end-users through what is called the "installed capacity" ("ICAP") market.[4] Wholesale customers can buy their necessary power "by any of three methods: (a) acquiring capacity through bilateral contracts with other entities; (b) purchasing capacity credits in the PJM long-term auction market; or (c) purchasing capacity credits in the PJM daily auction market." *Id.* FERC regulates each of these purchasing methods.

### III. The Facts of the Instant Case

The Boroughs are municipal corporations organized and existing under the laws of the Commonwealth of Pennsylvania. Compl. ¶ 3; Def. Answer ¶ 3. The Boroughs own and operate electric distribution systems. *Id.* PPL Corporation is an energy and utility holding company of: (1) PPL Electric Utilities Corporation, a subsidiary that provides electric delivery service in Pennsylvania; (2) PPL Energy Plus, L.L.C., a subsidiary that markets wholesale electricity and acts as an EGS in

Pennsylvania; and (3) PPL Generation L.L.C., a subsidiary that owns and operates generating facilities. Compl. ¶ 4; Def. Answer ¶ 4. PPL Electric Utlities Corporation and PPL Energy Plus are wholly owned subsidiaries of PPL Corporation. Pl. Exh. 9. Prior to a corporate realignment completed in 2000, PPL Corporation was named PP & L, Inc. Compl. ¶ 4. After the realignment, PPL Electric Utilities Corporation assumed the rights and obligations of PP & L, Inc., which existed under a Settlement Agreement entered into by PP & L, Inc. and the Boroughs, dated January 29, 1998 ("Settlement Agreement"). Def. Answer ¶ 4.

Following the passage of the Competition Act, all public utilities in Pennsylvania were required to submit, for the PUC's review, broad restructuring plans for implementing the deregulation of the energy market. 66 Pa. Cons.Stat. § 2806(d). PPL submitted its restructuring plan to the PUC on April 1, 1997, which included, *inter alia*, proposed unbundled rates, CTCs and tariff provisions, as well as a proposed stranded cost calculation. Pl. Exh. 15, p. 6. After significant debate before the PUC between PPL and thirty-six intervening parties regarding the terms of the plan, the PUC adopted an opinion and order which substantially modified PPL's restructuring plan. *Id.* at 8. It seems neither side was satisfied with the PUC's revisions, as a number of parties filed suit in either a United States District Court or Pennsylvania Commonwealth Court. *Id.* at 9.

On August 12, 1998, PPL and the intervening parties, which included various Pennsylvania administrative agencies, reached an agreement and filed a Joint Petition for a Full Settlement of PP & L,

---

**4.** The specifics of installed capacity and how the ICAP market works are not important at

this juncture and will therefore not be discussed.

Inc.'s Restructuring Plan and Related Court Proceedings ("Joint Petition"), with the PUC. Pl. Exh. 15, p. 3. The Joint Petition became effective once it was approved by the PUC in a final order dated August 27, 1998. Def. Exh. 11. In accordance with the Competition Act, the Joint Petition provided that PPL would remain the POLR in its original service territories, from 1999 through 2009, in order "to ensure the availability of universal electric service."[5] 66 Pa. Cons.Stat. § 2802(16), Pl. Exh. 15, p. 9, 15. PPL's designation as a POLR meant that throughout the period of restructuring, PPL "shall continue to have the full obligation to serve, including the connection of customers, the delivery of electric energy and the production or acquisition of electric energy for customers." 66 Pa.C.S. § 2807(e). The Final Order also approved an overall retail electric rate decrease and an increase in the amount of the shopping credit customers who wanted to switch to a different EGS would receive. Def. Exh. 11, p. 3. This order governs the sale of power by PPL to any retail consumer in Pennsylvania.

As of March 15, 1994, the Boroughs purchased capacity, energy, and transmission services from PP & L. Pl. Exh. 2, Tab A, Art. I. Thus PPL sold electricity to the Boroughs; the Boroughs then resold this electricity to their own residents. On May 8, 1996, after FERC issued Order No. 888, a number of Pennsylvania boroughs, including the plaintiffs, filed a proceeding before FERC "to determine their liability, if any, to PP & L for 'stranded costs' if they were to stop purchasing capacity and energy from PP & L following the initial 5-year terms of their current agreements with PP & L." Pl. Exh. 2, Tab A, Art. I. On January 29, 1998, PPL and the Boroughs reached a Settlement Agreement, which was submitted to FERC for approval. Pl. Exh. 2, Tab A. The agreement resolved the stranded cost issues between the parties at that time (PPL would not seek stranded costs from the Boroughs)[6] and modified their current power supply agreements. *Id.* FERC approved this settlement on May 29, 1998. Def. Ex. 17.

As part of the Settlement Agreement, PPL and each of the Boroughs entered into new, five year power supply agreements ("Power Supply Agreements"), which commenced on February 1, 1999 and ran through January 31, 2004. Pl. Exh. 2, Tab B, p. 1. These Agreements provided that the Boroughs would purchase from PPL their wholesale capacity and energy requirements at set rates for the first three years of the Agreements (February 1, 1999 through January 31, 2002). Pl. Exh. 2, Tab A, p. 8. For years four and

5. Though plaintiffs claim that the Joint Petition designates PPL as the sole POLR in its territories, this is not entirely the case. Pl. Statement of Facts, ¶ 17. The Joint Petition specifically states that "20% of PPL's residential customers—determined by random selection ...—shall be assigned to a provider of last resort default supplier *other than PP & L* that will be selected on the basis of a Commission-approved energy and capacity market price bidding process. This service shall be referred to as Competitive Default Service ('CDS')." Pl. Exh. 15, p. 16 (emphasis added). The Joint Petition goes on to specify that "PP & L's EDC or PP & L's divisional or affiliated EGS's may not bid (either directly or as a partner or participant in any business combination with a bidder) on CDS service" and if "the number of residential customers served by the CDS has fallen below 17%, a further random selection of customers shall be assigned to CDS service to restore the number of customers for the 20% level." *Id.* at 17–18.

6. The precise meaning of this agreement is at issue in the instant case. More specifically, exactly which stranded costs, i.e. wholesale or retail, PPL forfeited the right to collect from the Boroughs, is a central issue in the resolution of the Boroughs' claims.

five of the Agreements, the Boroughs were entitled to request a lower wholesale rate, which PPL was entitled to accept or decline. *Id.* at p. 9–10. If PPL declined the Boroughs' request for a lower rate, the Boroughs had the right to unilaterally terminate the contract. *Id.* In years four and five of the Agreements, PPL had corresponding rights to request a higher wholesale rate, with the Boroughs having similar rights to accept or decline. *Id.*

## STANDARD OF REVIEW

Either party to a lawsuit may file a motion for summary judgment, and the court will grant it "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.,* 90 F.3d 737, 743 (3d Cir.1996) (citation omitted). When a court evaluates a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed," *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and "all justifiable inferences are to be drawn in [the non-movant's] favor." *Id.* Additionally, "[s]ummary judgment may not be granted ... if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed." *Ideal Dairy,* 90 F.3d at 744 (citation omitted). However, "an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judg-

ment." *Robertson v. Allied Signal, Inc.,* 914 F.2d 360, 382 n. 12 (3d Cir.1990).

To defeat summary judgment, the non-moving party cannot rest on the pleadings, but rather that party must go beyond the pleadings and present "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). Similarly, the non-moving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion. *Williams v. Borough of W. Chester,* 891 F.2d 458, 460 (3d Cir.1989) (citing *Celotex v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Further, the non-moving party has the burden of producing evidence to establish prima facie each element of his claim. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548. The non-movant must show more than "[t]he mere existence of a scintilla of evidence" for elements on which he bears the burden of production. *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted).

When faced with whether a plaintiff has offered sufficient proof of an agreement in violation of the antitrust laws, which would preclude summary judgment for a defendant, a court generally applies the same summary judgment standards that apply in other contexts. *InterVest Inc. v. Bloomberg, L.P.,* 340 F.3d 144, 159–60 (3d Cir.2003). A court "should not tightly compartmentalize the evidence put forward by the nonmovant, but instead should analyze it as a whole to see if it supports an inference of concerted action." *Petruzzi's IGA v. Darling–Delaware,* 998 F.2d 1224, 1230 (3d Cir.1993).

Although these normal summary judgment principles apply in antitrust cases, an important distinction exists. As the Supreme Court held in *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case" so that certain "inferences may not be drawn from circumstantial evidence in an antitrust case." *InterVest*, 340 F.3d at 160. "This higher threshold is imposed in antitrust cases to avoid deterring innocent conduct that reflects enhanced, rather than restrained, competition." *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 357 (3d Cir.2004)

## DISCUSSION

### I. Defendants' Motion for Summary Judgment on Plaintiffs' Antitrust Claims

#### A. *Violation of the Sherman Act § 1*

Defendants argue that the plaintiffs have failed to provide any evidence in support of their allegation that defendants violated § 1 of the Sherman Act, codified at 15 U.S.C. § 1. As the statute and corresponding case law make clear, in order to establish a violation of the Sherman Act § 1, a plaintiff must prove the existence of a "contract, combination ... or conspiracy [which results] in restraint of trade or commerce among the several States." 15 U.S.C. § 1; *see also, e.g., Standard Oil Co. v. United States*, 221 U.S. 1, 59, 31 S.Ct. 502, 55 L.Ed. 619 (1911).

■■■ Despite its broad language, Section 1 of the Sherman Act only prohibits contracts, combinations, or conspiracies that unreasonably restrain trade. *See InterVest Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 158 (3d Cir.2003). Certain restraints of trade are *per se* unreasonable, because of their "pernicious effect on competition and lack of any redeeming virtue." *Northern Pac. Ry. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). In the interests of "business certainty and litigation efficiency," conduct that is manifestly anticompetitive is conclusively presumed to unreasonably restrain competition. *Ariz. v. Maricopa County Medical Soc.*, 457 U.S. 332, 343, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982). When reviewing claims of *per se* illegality, plaintiffs need only prove that there exists a contract, combination or conspiracy that was the proximate cause of their injury. *InterVest, Inc.*, 340 F.3d at 159.

#### 1. *Plaintiffs Fail to Establish the Existence of an Agreement to Fix Prices or Allocate Markets*

Plaintiffs allege that defendants engaged in *per se* illegal price-fixing and market allocation. The Supreme Court has held that "uniform price-fixing by those controlling in any substantial manner a trade or business in interstate commerce" is *per se* unreasonable. *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 212, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). Price fixing agreements "are all banned because of their actual or potential threat to the central nervous system of the economy." *Id.* at 224, n. 59, 60 S.Ct. 811. Additionally, the Supreme Court has stated that one of the "classic examples of a *per se* violation of § 1 is an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition." *United States v. Topco Assocs.*, 405 U.S. 596, 608, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972). Therefore, plaintiffs need only prove there is a question of fact as to the existence of a contract to fix prices or allocate markets and that this contract was the proximate cause of their injury, to meet their burden on sum-

mary judgment. The defendants argue that no such agreement exists.

■ In response to defendants' argument, plaintiffs point to (1) letter agreements in which various companies promised PPL that they would not oppose the PPL's position before the PUC, Pl. Br. 14; Pl. Exh. 14; and (2) the Joint Petition, Pl. Exh. 15. Plaintiffs believe that reading the letter agreements and Joint Petition together makes it clear that defendants engaged in illegal price fixing and division of markets. Pl. Br. 14–15; Pl. Statement of Facts. ¶ 17. This court disagrees with the plaintiffs for the reasons that follow and, accordingly, defendants' motion for summary judgment on the plaintiffs' claim for violation of the Sherman Act § 1 will be granted.

■ The Third Circuit has interpreted the "contract, combination, or conspiracy" language in Section 1 of the Sherman Act to require "some form of concerted action." *Alvord–Polk, Inc. v. Schumacher & Co.*, 37 F.3d 996, 999 n. 1 (3d Cir.1994). In other words, there must be a " 'unity of purpose or a common design and understanding or a meeting of minds' " or " 'a conscious commitment to a common scheme.' " *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 79 L.Ed.2d 775, (1984) (quoting *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 111 (3d Cir.1980)).

Plaintiffs assert that defendants entered into letter agreements as part of an anticompetitive program whereby three competitor power suppliers, "agreed to provide electricity service restricted to its existing retail customers for a period through December 31, 2009, at fixed rates not based on its cost of service" and such agreements "were never filed with the PUC." Pl. Br. 14. Allegedly, this anticompetitive program would: "(1) result in all of [PPL's] existing retail customers remaining or re-turning as customers of PPL under the POLR rates through 2009, and (2) preclude the plaintiff-boroughs from being able to compete with PPL for such customers." *Id.*

In *Borough of Olyphant v. PPL*, No. 03–4023, 2004 WL 1091037, at *8, 2004 U.S. Dist. LEXIS 8958, *21 (E.D.Pa. May 14, 2004), *aff'd Borough of Olyphant v. PPL Corp.*, 153 Fed.Appx. 80 (3d Cir.2005), the plaintiff, the Borough of Olyphant (which is also a plaintiff in the present case), raised an identical claim regarding the letter agreements. As in *Olyphant*, the plaintiffs in the instant case fail to explain how these letter agreements are evidence of price fixing or market allocation. This court observed:

[t]he letters do not make any reference to POLR service, nor do they mention "rates" or "customers." Pl.Ex. [14]. Rather, the letters evidence agreements between certain companies, including PPL, not to oppose each others' restructuring orders before the PUC. Pl.Ex. [14]. In other words, the letters simply memorialize the signatory party's intent to sign the Joint Petition, in exchange for PPL agreeing not to oppose the signatory party's restructuring order before the PUC.

*Id.* Thus the letter agreements alone are not evidence of a common design and a meeting of minds such that they can be viewed as a contract to fix prices or allocate markets.

Plaintiffs attempt to demonstrate that the letter agreements are evidence of market allocation and price fixing, by arguing that they must be read together with the Joint Petition. Pl. Br. 15. Plaintiffs believe that:

[b]y referring to the Petition by PPL to the [ ]PUC, the [letter] agreements incorporated by reference the substance of

that petition, which expressly provided that:

> C.1. PP & L agrees that, for the duration of the CTC/ITC Recovery period, it will serve as a provider of last resort for all retail customers in its service territory that do not choose or cannot choose to purchase power from alternate suppliers subject to the following terms, conditions, and qualifications. . . . PP & L will charge customers its tariff rates as set forth in Appendices A and B.

Pl. Exh. 15, pp. 15–16. PPL's reference in the secret letters to its petition to the [ ]PUC confirmed that the secret agreements referred to PPL's proposed fixed price of its POLR service through 2009 to its customers, which alone could be provided by PPL under the terms of the agreement.

Pl. Statement of Facts, ¶ 17.

The letter agreements and the Joint Petition, even when read together, do not support the plaintiffs' assertions that they demonstrate unlawful market allocation. Plaintiffs have rehashed the exact same argument raised and rejected by this court and the Third Circuit in *Borough of Olyphant*, 2004 WL 1091037, at *8, 2004 U.S. Dist. LEXIS 8958, at *21, *aff'd* 153 Fed. Appx. 80 (3d Cir.2005). As this court pointed out in *Olyphant*:

> Plaintiff's allegation of "market allocation" is totally specious. Defendants' agreement to remain "the provider of last resort for all retail electric customers in its service territory that do not choose or cannot choose to purchase power from alternative suppliers," Pl. Ex. [15] at 15–16, does not restrict competition. Rather, this agreement simply complies with the requirement of 66 Pa. Cons.Stat. § 2807 that "[w]hile an electric distribution company collects either a competitive transition charge or an

intangible transition charge . . . the electric distribution company shall continue to have the full obligation to serve. . . ." 66 Pa. Cons.Stat. § 2807(e).

PPL was required by statute to become a POLR and the Joint Petition, among other things, laid out the parameters of this designation. *See* 66 Pa. Cons.Stat. §§ 2802(16) and 2807(e). The Joint Petition makes it clear that customers were free to purchase energy from *any* alternative supplier, and the company designated as the POLR functions solely as a safety net so that retail customers will always be able to purchase electricity from at least one utility. Pl. Exh. 15, pp. 13, 20 ("Customer savings may be greater if, for example, customers obtained lower prices from a competitive supplier"). PPL is serving only as the *provider of last resort;* plaintiffs and the power suppliers who signed the letter agreements are free to sell energy to any customer in PPL's original service territory.

Additionally, though plaintiffs claim that the Joint Petition designates PPL as the sole POLR in its territories and therefore allocates the market only to PPL, this is not the case. Pl. Statement of Facts, ¶ 17. The Joint Petition specifically states that "20 of PPL's residential customers—determined by random selection . . .—shall be assigned to a provider of last resort default supplier *other than PP & L* that will be selected on the basis of a Commission-approved energy and capacity market price bidding process. This service shall be referred to as Competitive Default Service ('CDS')." Pl. Exh. 15, p. 16. (emphasis added). The Joint Petition goes on to specify that "PP & L's divisional or affiliated EGS's may not bid (either directly or as a partner or participant in any business combination with a bidder) on CDS service" and if "the number of residential customers served by the CDS has fallen

below 17%, a further random selection of customers shall be assigned to CDS service to restore the number of customers for the 20% level." *Id.* at 17–18. Plaintiffs, as well as the PPL competitors who signed the letter agreements, could bid to become the CDS to PPL's residential customers. Because any EGS could bid on becoming the 20% CDS and consumers throughout the state of Pennsylvania may purchase energy from *any* EGS, such as the plaintiffs or the competitors in the letter agreements, it is unclear how the Joint Petition provides for the allocation of markets.

Plaintiffs also claim that the Joint Petition and letter agreements set fixed energy rates through 2009.[7] However, as this court pointed out in *Olyphant*:

> the Joint Petition did not set any prices, but rather requested the PUC to make changes to PPL rates the Commission had approved in prior restructuring orders. The PUC did, in fact, approve those changes in an order dated August 27, 1998, concluding, 'Consistent with the fundamental goals of [the Electric Competition Act, 66 Pa. Cons.Stat. § 2801 et seq.], the settlement provides for an orderly transition ... to a structure under which retail consumers will have direct access to a *competitive market* for the generation of electricity.' Def. Ex. [11] at 7. In other words, the PUC recognized that the rates contained in the Joint Petition actually *increased* competition.

*Olyphant*, 2004 WL 1091037, at *8, 2004 U.S. Dist. LEXIS 8958, at *22, *aff'd Borough of Olyphant v. PPL Corp.*, 153 Fed. Appx. 80 (3d Cir.2005). Additionally, the

Joint Petition increased the chance that customers would be able to effectively "shop" for electricity from alternative suppliers, i.e. find a supplier whose generation rates were better priced than those of PPL. Reading the letter agreements together with the Joint Petition, does not change the fact that the Joint Petition itself did not fix energy rates. Thus, plaintiffs have not provided evidence of the existence of a contract to fix prices or allocate markets.

### 2. Plaintiffs Sherman Act § 1 Claims are Barred by the Noerr–Pennington Doctrine

 Defendants argue further that the Joint Petition is protected under the *Noerr–Pennington* doctrine, which holds that "[a] party who petitions the government for redress generally is immune from antitrust liability." *Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119, 122 (3d Cir. 1999), *cert. denied*, 528 U.S. 871, 120 S.Ct. 173, 145 L.Ed.2d 146 (1999). More specifically, parties are immune from antitrust liability arising from antitrust injuries caused by the act of petitioning itself, *Eastern R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 143, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), or from government action which results from the petitioning, *United Mine Workers v. Pennington*, 381 U.S. 657, 671, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). "Petitioning is immune from liability even if there is an improper purpose or motive." *A.D. Bedell Wholesale Co. v. Philip Morris Inc.*, 263 F.3d 239, 251 (3d Cir.2001).

 The Noerr–*Pennington* doctrine immunizes actions that violate the Sherman Act because the "federal antitrust

---

**7.** Plaintiffs allege that the POLR rates were fixed at "below-market" rates. Pl. Br. 18. Plaintiffs provide a PPL rate schedule, which was allegedly attached to the Joint Petition, to support their argument. Pl. Exh. 25. However, plaintiffs provide no evidence of the prevailing market rate for energy generation to retail customers, from which one could determine that the POLR rates were "below-market." Pl. Exh. 25.

laws do not regulate the conduct of private individuals in seeking anticompetitive action from the government." *City of Columbia v. Omni Outdoor Advertising*, 499 U.S. 365, 379, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991). The application of antitrust laws is inappropriate once it is determined that the government itself, rather than a private actor, is the relevant decision maker, even if the resulting decision is anticompetitive. *Noerr*, 365 U.S. at 135, 81 S.Ct. 523.

■ Defendants are immune under the Noerr–Pennington doctrine. Following the deregulation of the Pennsylvania energy markets, PPL was required by statute to file a restructuring plan with the PUC. 66 Pa. Cons.Stat. § 2806(d). The Joint Petition is a settlement agreement relating to issues surrounding PPL's restructuring plan and the "petition itself did not effectuate any changes to the rates, but rather requested the PUC to make changes to PPL rates." *Olyphant*, 2004 WL 1091037, at *8, 2004 U.S. Dist. LEXIS, at *25; *See* Pl. Exh. 15, pp. 3–4 (requesting the PUC's approval of the Joint Petition).

Though "[p]assive government approval is insufficient" to obtain immunity under the Noerr–Pennington doctrine, there was active government approval of the Joint Petition. *Bedell*, 263 F.3d at 251. Three of the parties to the Joint Petition, the Office of Consumer Advocate, the Office of Small Business Advocate, and the Office of Trial Staff, are Pennsylvania administra-

tive agencies. Pl. Exh. 15, p. 2; *see* 71 Pa. Stat. § 309-2 (creating the Office of Consumer Advocate), 73 Pa. Stat. § 399.43 (creating the Office of Small Business Advocate), 66 Pa. Cons.Stat. § 306 (creating the Office of Trial Staff). Representatives of all three agencies signed the Joint Petition.[8] Def. Exh. 12. Additionally, the PUC, a Pennsylvania administrative agency,[9] approved the Joint Petition in a twenty-three page, final order on August 27, 1998. Def. Exh. 11. Defendants' petitioning activities fall within the traditional type of government petitioning which is afforded Noerr–Pennington immunity. Therefore, plaintiffs are immune from antitrust liability for any injures resulting from the PUC's approval of the Joint Petition.

Plaintiffs argue that the court in *Olyphant* "dismissed out of hand the so-called 'sham exception' to the [Noerr–Pennington] doctrine." Pl. Br. 19. In *Olyphant* this court stated:

> There is a 'sham' exception to the Noerr–Pennington doctrine which holds that using the petitioning process simply as an anticompetitive tool without legitimately seeking a positive outcome to the petitioning destroys immunity. There is no suggestion that the sham exception applies here.

*Olyphant*, 2004 WL 1091037, at *8, 2004 U.S. Dist. LEXIS 8958 at *26, n. 11, *aff'd* 153 Fed.Appx. 80 (3d Cir.2005), quoting *A.D. Bedell*, 263 F.3d at 250, n. 9. Yet plaintiffs provide no legal argument or evi-

---

**8.** Plaintiffs recognized that the Joint Petition provided as Plaintiff Exhibit 15 was an incomplete copy and claimed to include a complete copy as Plaintiff Exhibit 25. *See* Pl. Sur–Reply to Statement of Facts, ¶ 17, n. 4. However, Plaintiff Exhibit 25 appears to be a PPL rate schedule and it is unclear how it is related to the Joint Petition. Defendants have provided the court with what appears to be a full copy of the Joint Petition, minus the appendixes. Def. Exh. 12.

**9.** The Supreme Court has extended Noerr–Pennington immunity to petitions brought before state and federal administrative agencies since they "are both creatures of the legislature, and arms of the executive." *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510–11, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972).

dentiary support for the application of the sham exception, other than a single quote from *City of Columbia v. Omni Outdoor Advertising,* 499 U.S. 365, 380, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991) (citing that the sham exception to *Noerr* "encompasses situations in which persons use the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon.") (emphasis in original).

The Supreme Court has said that the sham exception applies to " 'private action that is not genuinely aimed at procuring favorable government action,' as opposed to 'a valid effort to influence government action.' " *Professional Real Estate Investors v. Columbia Pictures Indus.,* 508 U.S. 49, 58, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993) (*"PRE"*) citing *Allied Tube & Conduit Corp. v. Indian Head, Inc.,* 486 U.S. 492, 500, n. 4, 108 S.Ct. 1931, 100 L.Ed.2d 497 (1988). It is irrelevant that a private party's motive is selfish in seeking such government action. *Omni Outdoor Advertising,* 499 U.S. at 380, 111 S.Ct. 1344. In their Sherman Act § 1 claim, plaintiffs do not argue nor do they provide any evidence that PPL did not genuinely seek PUC approval of the Joint Petition. Plaintiffs instead object to the actual terms and rate proposals in the Joint Petition as violative of the antitrust laws. Pl. Br. 16–17. However, as discussed earlier, the Joint

Petition requested that the PUC make the proposed changes and the PUC did, in fact, approve those changes. There is no evidence that this is not a case of genuine petitioning; therefore, the sham exception to Noerr–Pennington immunity does not apply.[10] *Omni Outdoor Advertising,* 499 U.S. at 380, 111 S.Ct. 1344 (finding that the sham exception to Noerr–Pennington immunity does not apply to a defendant who "genuinely seeks to achieve his governmental result, but does so *through improper means.")* (emphasis in original) (internal quotations and citations omitted); *PRE,* 508 U.S. at 58, 113 S.Ct. 1920 ("[W]e have explicitly observed that a successful 'effort to influence governmental action ... certainly cannot be characterized as a sham.' ") (internal quotations and citations omitted).

Plaintiffs argue that the letter agreements do not fall within the scope of the Noerr–Pennington immunity because these letters preceded and were not dependant upon any action on the part of PUC. Pl. Br. 19–21. Plaintiffs correctly cite *Allied Tube & Conduit Corp. v. Indian Head, Inc.,* 486 U.S. 492, 503, 108 S.Ct. 1931, 100 L.Ed.2d 497 (1988), for the notion that the Noerr–Pennington doctrine does not extend to "every concerted effort that is genuinely intended to influence gov-

---

**10.** Plaintiffs argue that the application of the sham exception is not appropriately decided on summary judgment. Pl. Br. 21. However, in the two cases plaintiffs cite to support their argument, the courts found there were material issues of fact regarding the application of the sham exception that precluded summary judgment. *See Kravco Co. v. Valley Forge Center Assoc.,* 1992 WL 97926, *3, 1992 U.S. Dist. LEXIS 6478, 10–11 (E.D.Pa.1992) (finding "there are conflicts between plaintiffs' and defendants' version of the events" as to whether the sham exception applies, so that summary judgement was not appropriate "at least on the present state of the record."), *Lansdale v. Philadelphia Elec. Co.,* 517

F.Supp. 218, 222 (E.D.Pa.1981) (finding that plaintiffs provided sufficient evidence to show there was a question of fact as to whether the sham exception to Noerr–Pennington immunity applies). To defeat summary judgment, plaintiffs can not rely on unsupported assertions that the sham exception applies, but rather must present "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). In the instant case plaintiffs offer no evidence that PPL was seeking "private action that is not genuinely aimed at procuring favorable government action." *Allied Tube,* 486 U.S. at 500, n. 4, 108 S.Ct. 1931.

ernment action." However, the Supreme Court goes on to conclude "that the Noerr immunity of anticompetitive activity intended to influence the government depends not only on its impact, but also on the context and nature of the activity." *Id.* at 504, 108 S.Ct. 1931. In *Allied Tube* the defendants allegedly manipulated the process for establishing an influential private association's standards to exclude a rival technology from the market. *Id.* at 496–499, 108 S.Ct. 1931. The Supreme Court makes it extremely clear that its holding, that there was no Noerr immunity from antitrust liability, was "expressly limited to cases where 'an economically interested party exercises *decisionmaking* authority in formulating a product standard for a private association that comprises market participants'" *Id.* at 511, n. 13, 108 S.Ct. 1931 (emphasis in the original) (quoting from p. 509–510 of the opinion).

This court concludes that the letter agreements are easily distinguished from the type of activity in *Allied Tube* which did not receive Noerr–Pennington immunity. The letter agreements do not reflect efforts on the part of PPL to influence a standard-setting private organization. Unlike in *Allied Tube*, the letter agreements are not part of a private standard setting process.[11] A letter agreement between competitors not to contest the other's administrative agency petition is not an act of influence before a private organization; the letters are better viewed as "incidental" to the Joint Petition. *Allied Tube*, 486 U.S. at 499, 108 S.Ct. 1931, citing *Noerr*, supra, at 143, 81 S.Ct. 523 ("[W]here, independent of any government action, the anticompetitive restraint results directly from private action, the restraint cannot form the basis for antitrust liability if it is 'incidental' to a valid effort to influence governmental action"). Because the letter agreements are incidental[12] to PPL's Joint Petition they are therefore subject to Noerr Pennington immunity.

Neither the letter agreements themselves nor the letter agreements read together with the Joint Petition raise a genuine issue of material fact concerning whether defendants engaged in either price fixing or market allocation in violation of the Sherman Act § 1. Additionally,

**11.** Plaintiffs also cite *Ticor Title Ins. Co. v. FTC*, 998 F.2d 1129 (3d Cir.1993) in support of their argument that the Noerr Pennington doctrine does not apply. In that case the plaintiffs, five of the nation's largest title insurers, collectively agreed to set uniform rates for title search and examination services through state ratings bureaus. *Id.* at 1131. Ratings bureaus are private entities, licensed by the state, and the rates became effective unless the state rejected them within a period of time. *See FTC v. Ticor Title Ins. Co.*, 504 U.S. 621, 628, 112 S.Ct. 2169, 119 L.Ed.2d 410 (1992). Relying on *Allied Tube*, the Third Circuit found Noerr Pennington immunity unavailable because the plaintiffs' anticompetitive conduct was in a private marketplace. *Ticor*, 998 F.2d at 1138, quoting *Allied Tube*, 486 U.S. at 507, 108 S.Ct. 1931. However, in this case, PPL was petitioning a state government agency for rate approval and no rates were set absent the PUC's active approval of the Joint Petition, unlike *Ticor* where rates were deemed to have government approval by the state agency's failure to object. Additionally, other Pennsylvania state agencies were a part of the petitioning process, unlike the solely private agreements arrived at in *Ticor*.

**12.** Even if the letter agreements are not subject to Noerr Pennington immunity, they are still not evidence of anticompetitive activity independent of the Joint Petition. As discussed supra, plaintiffs fail to explain how these letter agreements are evidence of price fixing or market allocation. Pl. Exh. 14. In fact, the part of the letter agreements pertaining to the Joint Petition, is not binding without approval of the Joint Petition by the PUC. See Pl. Exh. 14, p. 7 ("This agreement is expressly conditioned upon the Pa. PUC's entry of a final order approving the Joint Petition").

even if the plaintiffs had established an issue of material fact, defendants are entitled to immunity under the Noerr Pennington doctrine. Accordingly, defendants' motion for summary judgment on plaintiffs' claims for violation of the Sherman Act § 1 will be granted.[13]

### B. Violation of the Sherman Act § 2

Plaintiffs claim that defendants violated § 2 of the Sherman Act, which prohibits monopolization or attempted monopolization of a trade, either single-handedly or via a combination or conspiracy. 15 U.S.C. § 2. First, plaintiffs claim that defendants "have monopolized the sale of electric power in the wholesale power market available to the Boroughs to increase the price of power therein to the Boroughs, resulting in increases in the cost of power to the Boroughs under their present Power Contracts with PPL." Compl. ¶¶ 14, 15. Plaintiffs also specifically allege that defendants created a "price squeeze" by requiring plaintiffs "to pay wholesale prices for electric power substantially higher than the retail prices the Defendants charge for comparable service to its commercial and industrial customers, based on the additional charge demanded of Plaintiffs by Defendants." Compl. ¶ 14, 18.

Defendants argue that plaintiffs have failed to provide any concrete evidence in support of their allegation that defendants violated § 2 of the Sherman Act. Defendants also argue that the filed rate doctrine is applicable to bar plaintiffs' claims. For the reasons that follow, I will grant defendants' motion for summary judgment on plaintiffs' Sherman Act § 2 claims.

### 1. The Filed Rate Doctrine

The "filed rate" doctrine "bars antitrust suits based on rates that have been filed and approved by federal agencies." *Utilimax.com, Inc. v. PPL Energy Plus, LLC,* 378 F.3d 303, 306 (3d Cir.2004) (citations omitted); *see also Keogh v. Chicago & N.W. Ry. Co.,* 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922). "Under the filed rate doctrine, a plaintiff may not sue the supplier of electricity based on rates that, though alleged to be the result of anticompetitive conduct, were filed with the federal agency responsible for overseeing such rates." *Id.* citing *Montana–Dakota Utils. Co. v. N.W. Pub. Serv. Co.,* 341 U.S. 246, 251–52, 71 S.Ct. 692, 95 L.Ed. 912 (1951). "The considerations underlying the doctrine ... are preservation of the agency's primary jurisdiction over reasonableness of rates and the need to insure that regulated companies charge only those rates of which the agency has been made cognizant." *City of Cleveland v. FPC,* 525 F.2d 845, 854 (D.C.Cir.1976).

Numerous courts have held that the filed rate doctrine applies equally to rates filed with state agencies. *See Wegoland Ltd. v. NYNEX Corp.,* 27 F.3d 17, 20 (2d Cir.1994); *Taffet v. Southern Co.,* 967 F.2d 1483, 1494 (11th Cir.1992) (holding that the filed rate doctrine applies with equal force whether the rate at issue was set by a state or federal rate-making authority); *H.J., Inc. v. Northwestern Bell Tel. Co.,* 954 F.2d 485, 494 (8th Cir.1992) ("the rationale underlying the filed rate doctrine applies whether the rate in question is approved by a federal or state agency").

---

**13.** Defendants also argue that the Joint Petition and resulting PUC Final Order are protected by the state-action immunity doctrine, also known as the Parker doctrine. Def. Br. 31. Because, as discussed supra, the court is satisfied that the letter agreements and Joint Petition do not raise a material issue of fact concerning whether defendants violated the Sherman Act and that even if they did, defendants are entitled to Noerr Pennington immunity, there is no need to discuss the Parker doctrine.

The filed rate doctrine can be a defense to both federal and state law actions based on the regulated rates. *See Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 578, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981) (finding that under the filed rate doctrine, "courts lack authority to impose a different rate than the one approved by the Commission").

The form or details of the filed rate are not relevant to the application of the filed rate doctrine; the rate need only be filed with an agency responsible for overseeing such rates. *See Am. Tel. & Tel. Co. v. Central Office Tel.*, 524 U.S. 214, 222, 118 S.Ct. 1956, 141 L.Ed.2d 222 (1998) (stating the doctrine applies even if it results in the application of the filed rate when a defendant intentionally misrepresented the promised rate). The filed rate doctrine is applicable to market-based rates set through auctions where FERC approved the market mechanism for establishing the rates or the rates were filed with the FERC. *See Utilimax*, 378 F.3d at 306 (finding that the filed rate doctrine applied because PPL charged rates that were in conformity with the requirements of the FERC and PJM approved market model), *Public Util. Dist. No. 1 of Snohomish County v. Dynegy Power Mktg., Inc.*, 384 F.3d 756, 761 (9th Cir.2004) (holding that FERC does enough regulation under the market-based system of setting wholesale electricity rates to justify federal preemption of state laws under the filed rate doctrine), *Town of Norwood v. New England Power Co.*, 202 F.3d 408, 419 (1st Cir.2000) (finding that the filed rate doctrine applies to market-based rates because "FERC is still responsible for ensuring just and reasonable rates and, to that end, wholesale power rates continue to be filed and subject to agency review").

*2. The Filed Rate Doctrine Bars Recovery by the Boroughs*

FERC is the federal agency that regulates the sale of wholesale electricity in interstate commerce. 16 U.S.C. § 824(b). In this regard, FERC is charged with ensuring that wholesale rates are "just and reasonable," 16 U.S.C. § 824d(a). To this end, PPL filed copies of the Settlement Agreement and Power Supply Agreements defendants entered into with each Borough with FERC. Def. Exh. 17, 18. These agreements declared the wholesale electricity rates PPL would charge the Boroughs over the life of the agreement. Pl. Exh. 2, Tabs A and B. FERC also reviewed and approved PJM's rules and operating agreements, which described in detail how the governance, market, and operations structures of PJM would function.

■ Plaintiffs' price squeeze claim is barred by the filed rate doctrine. Plaintiffs allege that the defendants created a price squeeze in violation of Sherman Act § 2. Plaintiffs' claim rests on the combined effect of two different tariffs: the rates PPL was required to charge POLR customers under the PUC-approved Joint Petition, and the wholesale rate PPL offered to the Boroughs pursuant to the Power Supply Agreements filed with FERC. Pl. Br. 11–12. Plaintiffs allege that PPL increased the price of wholesale electricity to the Boroughs in each of the last two contract years, while the rates PPL charged its POLR customers was locked in under the Joint Petition discussed, *see* supra Section A. The wholesale rate plaintiffs complain of was subject to FERC regulation under the "just and reasonable" standard imposed by the Federal Power Act, 16 U.S.C. § 824d(a). *Utilimax*, 273 F.Supp.2d at 584 (applying the filed rate doctrine where PPL charged rates that conformed to FERC requirements and PJM rules), *aff'd* 378 F.3d 303 (3d Cir. 2004) (*"Utilimax (3d. Cir.)"*). Additional-

ly, the retail rates PPL charged as a POLR were filed with and approved by the PUC. Def. Exh. 11. It is clear that plaintiffs' claims are rate-related because they request damages for the price squeeze claim based on the "difference between the rates that the Borough would have paid in years four and five of the contracts and what they would have paid had PPL not been able to extract its five percent price increase in each of those years." Pl. Br. 34. The filed rate doctrine applies to bar all damages for plaintiffs' claim asserting that rates "submitted to, and approved by [FERC were] the product of an antitrust violation." *Square D*, 476 U.S. at 422, 106 S.Ct. 1922.

Plaintiffs' more general monopolization claim under Sherman Act § 2 rests on the ground that PPL's actions in the ICAP market caused the plaintiffs to pay an inflated rate for wholesale electricity under their Power Supply Agreements. Pl. Br. 7. Plaintiffs claim that PPL exerted monopoly power to increase the price for capacity in the ICAP market. Plaintiffs allege that this monopolization caused the price of energy in the wholesale market to increase. *Id.* This allegedly injured plaintiffs because, when they were testing the market in years four and five of the Power Supply Agreements, they were unable to obtain lower quotes for wholesale energy, thus they accepted, rather than declined, PPL's proposed five percent increases made pursuant to the Power Supply Agreements. Id. at 10.

In a virtually identical case, the court found that anti-trust claims based on rates established in the ICAP market created by PJM are barred by the filed rate doctrine. *Ultimax*, 273 F.Supp.2d at 584–586, *aff'd*, 378 F.3d 303 (3d Cir.2004).

> The filed rate doctrine applies to bar claims challenging the rates set by FERC in a market-based rate system.

*See Town of Norwood, Mass. v. New England Power Co.*, 202 F.3d 408, 419 (1st Cir.2000) (finding filed rate doctrine should apply where the "regulated rates" have been left to the free market). In this case, although the rates charged were market-based rates, FERC approved these rates as a means of achieving "just and reasonable" rates in advance of authorizing the PJM market to operate. As such, the rates charged by wholesale electricity generators were the legal rates and the filed rate doctrine applies.

*Id.* at 585, n. 18. The Third Circuit affirmed the dismissal of these antitrust claims, asserting that the ICAP

> rates, though allegedly excessive, were the result of PPL's temporary monopolistic position in the wholesale capacity market that was established and approved by FERC and PJM.... Utilimax makes no claim that PPL charged rates that were not in conformity with the requirements of the FERC and PJM-approved market model. Thus, absent an exception, the filed rate doctrine precludes Utilimax's claims against PPL.

*Utilimax (3d. Cir)*, 378 F.3d at 306.

Plaintiffs' claim, that they could have obtained offers to supply wholesale power at lower rates and therefore declined PPL's request for an increased wholesale rate pursuant to the contract, is based on alleged monopolistic behavior in the ICAP market. However, rates established in the ICAP market may not be the basis for an antitrust claim under the filed rate doctrine. Also, as discussed in the context of the price squeeze claim, the Power Supply Agreements, which detail the wholesale energy prices between PPL and the Boroughs, were filed with FERC and therefore fall under the ambit of the filed rate doctrine. Thus, any antitrust claim based

on the interaction between the rates is barred.

### 3. Exceptions to the Filed Rate Doctrine

The question, then, is whether the Boroughs can establish a pertinent limitation on, or exception to, the filed rate doctrine. Plaintiffs' broadest claim is that the filed rate doctrine is inapplicable to the present case because "the Supreme Court has definitively rejected any claim of antitrust immunity based on the FERC's regulatory jurisdiction," and "the Energy Policy Act of 1992 expressly excluded the federal antitrust laws from any FERC regulatory jurisdiction." Pl. Br. 30. However, although "the filed rate doctrine has been vigorously criticized ... the Supreme Court has declined an invitation to overturn the doctrine set out in *Keogh.*" *Utilimax*, 273 F.Supp.2d at 580, *aff'd* 378 F.3d 303 (3d Cir.2004). The Supreme Court has conceded that the filed rate doctrine might be "unwise as a matter of policy" but reaffirmed it nonetheless, because Congress had ample opportunity to overturn it but had not done so. *Square D. Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 420, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986). While the Supreme Court expressly rejected the filed rate doctrine as a type of antitrust immunity, the Court reaffirmed a narrowed interpretation of the filed rate doctrine, stating that "*Keogh* simply held that an award of treble damages is not an available remedy for a private shipper claiming that the rate submitted to, and approved by, the ICC was the product of an antitrust violation." *Id.* at 422, 106 S.Ct. 1922.[14] Thus, the filed rate doctrine still "bars recovery in overcharge actions by customers based on claims that a 'filed rate' constitutes an antitrust violation." *Utilimax*, 273 F.Supp.2d at 580.

Plaintiffs also argue that the filed rate doctrine does not apply to block claims brought by plaintiffs who are competitors of the defendant. Plaintiffs claim to compete with PPL in the retail electricity market. In 1979, the Third Circuit adopted the "competitor exception" to the filed rate doctrine, finding that the doctrine "has little or nothing to do with [the defendant's] duties under the antitrust laws toward its competitors in the equipment supply business; competitors are not the intended beneficiaries of that rule of public utility regulation." *Essential Communications Systems, Inc. v. American Tel. & Tel. Co.*, 610 F.2d 1114, 1121 (3d Cir.1979). Other courts have joined the Third Circuit in establishing a "competitor exception" to the filed rate doctrine. *See Cost Management Servs., Inc. v. Washington Natural Gas Co.*, 99 F.3d 937, 945–46 (9th Cir.1996) (exception in case where plaintiff was competitor, not customer), and *City of Groton v. Connecticut Light & Power Co.*, 662 F.2d 921, 927–29 (2d Cir. 1981) (exception in case where plaintiff was customer and competitor).

The Third Circuit recently reaffirmed the competitor exception. *Utilimax (3d. Cir.)*, 378 F.3d 303 (3d Cir.2004). The case involved a claim by Utilimax, a retail supplier of electricity, that purchased electricity and capacity credits in the wholesale market and then resold electricity in the retail market. *Id.* at 305. Like the

---

14. In their amended complaint, plaintiffs request injunctive relief; however, the basis for equitable relief is now moot because the Power Supply Agreements terminated on February 1, 2004. Compl. ¶ 24(b). Both of the plaintiffs' Sherman Act § 2 claims relate to the price PPL charged the Boroughs for wholesale energy. But plaintiffs no longer purchase wholesale energy from PPL, since the Power Supply Agreements terminated February 1, 2004. Pl. Exh. 2, Tab B, p. 2. Therefore, plaintiffs only relief can be in the form of monetary damages, to which the filed rate doctrine is applicable.

Boroughs, Utilimax did not generate electricity but instead purchased it in the wholesale market, although Utilimax purchased its own capacity credits in the daily ICAP market. *Id.* at 305–6. As in this case, the defendant, PPL, sold capacity credits in the ICAP market and also sold energy at the retail level. *Id.* Utilimax claimed that PPL exerted undue influence over the wholesale ICAP market where Utilimax was a customer. *Id.* Utilimax claimed that because it competed with PPL in the retail energy market, the competitor exception rendered the filed rate doctrine inapplicable. *Id.* at 307.

The Third Circuit refused to apply the competitor exception because Utilimax was both a customer in the wholesale energy market and a competitor in the retail energy market of PPL, but the claims arose out of the PPL's conduct in the wholesale ICAP market, in which plaintiff was not a competitor.[15]

> The only fair reading of these allegations is that Utilimax, as a customer in the wholesale electricity market, could not afford to pay the rates that PPL was able to charge because of its allegedly anticompetitive conduct. The result of Utilimax's inability to buy capacity offered by PPL in the wholesale market was that it went out of business in the retail market and PPL had one fewer competitor in that latter market. That result, however, came about because Utilimax (as a customer of PPL) could not afford to buy capacity. *While the ramifications were felt in its competitor*
>
> *role, the damage to Utilimax occurred because of its status as a customer of PPL.*

*Utilimax (3d. Cir.),* 378 F.3d at 307–308 (emphasis added). The Court went on to say that "when an entity buys something from another entity there is a customer/seller relationship for that transaction, even if the two entities are competitors under other circumstances." *Id.* at 308.

The competitor exception is not applicable to the case at bar. Although the Boroughs compete with PPL in the retail electricity market, both Sherman Act § 2 claims are based upon the Boroughs' status as a customer in the wholesale electricity market. Plaintiffs claim that defendants monopolized the ICAP market, which in turn increased the price of wholesale electric power "resulting in increases in the cost of power to the Boroughs under their present Power Contracts with PPL." Compl. ¶ 15. Plaintiffs also allege that defendants created a "price squeeze" by requiring plaintiffs "to pay wholesale prices for electric power substantially higher than the retail prices the Defendants charge for comparable service to its commercial and industrial customers, based on the additional charges demanded of Plaintiffs by Defendants." Compl. ¶ 18. In both of these claims, any damage felt by the Boroughs resulted from their relationship as a purchaser/customer of wholesale energy from PPL.

It is PPL's actions in the wholesale ICAP market that form the basis of the

---

**15.** Plaintiffs point to *City of Groton v. Connecticut Light & Power Co.,* 662 F.2d 921, 927 (2d Cir.1981) and *City of Kirkwood v. Union Electric Co.,* 671 F.2d 1173 (8th Cir.1982) to support the application of the competitor exception when plaintiffs are competitors as well as consumers. Although the courts in *City of Groton* and *City of Kirkwood* adopted the competitor exception in this context, this argument was rejected in *Utilimax.* The Third Circuit found that the competitor exception did not apply because "although it may have been a competitor with PPL in one market, it was a customer in the wholesale market. And it is PPL's actions in that latter market that form the corpus of Utilimax's complaint." *Utilimax (3d Cir.),* 378 F.3d at 308. I am, of course, bound to follow the decisions of the Third Circuit.

Boroughs' claims. The power contracts plaintiffs refer to are Power Supply Agreements that provide the terms under which PPL sells wholesale electricity to the Boroughs. Pl. Exh. 2, Tab B, p. 2 ("During the term of this Agreement, PP & L shall supply to Lansdale and Lansdale shall purchase from PP & L all of Lansdale's capacity and energy requirements"). Plaintiffs claim that PPL's actions in the ICAP market resulted in their inability to find an alternative lower priced wholesale electricity supplier, which in turn required plaintiffs to sustain five percent annual increases to the cost of wholesale electricity under their supply contract with PPL in 2001 and 2002. Pl. Br. 11, 33. Allegedly, the wholesale electricity rates the Boroughs paid to PPL in 2001 and 2002 were higher than the rates PPL was charging its POLR customers, under the PUC approved Joint Petition.[16] Pl. Br. 11–12. Though the ramifications of PPL's acts in the ICAP market were felt in the Boroughs' competitive role, the Boroughs were affected by PPL's acts by virtue of their role as a wholesale electricity customer of PPL. Therefore, the Boroughs do not qualify as competitors of PPL with respect to their claims and the competitor exception to the filed rate doctrine does not apply.

Plaintiffs also argue that PPL engaged in non-rate anticompetitive activity unrelated to the filed rate; therefore, the filed rate doctrine does not bar antitrust claims based on that activity.[17] Pl. Br. 31, 32–34. The Third Circuit has held that the filed rate doctrine "does not preclude liability based on non-rate anticompetitive activi-

ty." *In re Lower Lake Erie Iron Ore Antitrust Litigation,* 998 F.2d 1144, 1159 (3rd Cir.1993). In *Lower Lake Erie,* steel, dock, and trucking companies asserted antitrust claims against railroad companies, alleging that the railroads conspired to "preclude competitors from entering the market of lake transport, dock handling, storage and land transport of iron ore." *Id.* at 1151. The Third Circuit allowed the steel companies, customers of the railroads, to go forward with their damage claims despite the filed rate doctrine insofar as they alleged "non-rate anticompetitive activity." *Id.* at 1159. Specifically, claims "that the railroads conspired to protect their stronghold in the ore transport market by blocking entry to low-cost competitors" by "restricting the lease and sale of railroad-owned dock property and boycott[ing] non-railroad docks" were allowed to progress as claims of non-rate anticompetitive activity. Id. at 1153, 1159. However claims "that the railroads charged an unlawful rate" were barred. *Id.*

Most of the non-rate anticompetitive activities plaintiffs allege on the part of PPL are actually rate-based activities. Plaintiffs claim that PPL imposed "restrictive conditions on plaintiffs' purchase of electricity for resale as to make it impossible for the plaintiffs to compete for retail customers without economic penalty, and requiring plaintiffs to pay wholesale prices substantially higher than the retail prices PPL charged for comparable service to its commercial and industrial customers." Pl. Br. 33. Plaintiffs also claim that their price squeeze claim is an example of non-rate anticompetitive activity. *Id.* To back

16. Plaintiffs do not allege that they increased their retail electricity rates as a result of the cost increase in wholesale electricity.

17. Plaintiffs fail to cite any case law in support of their argument that the filed rate doctrine should not apply to non-rate anti-

competitive activity. The principal case discussing exceptions to the filed rate doctrine for non-rate anticompetitive activity discovered by the court is *In re Lower Lake Erie Iron Ore Antitrust Litigation,* 998 F.2d 1144, 1159 (3rd Cir.1993).

up these assertions, plaintiffs again rely on the Power Supply Agreements, alleging that in 2001 and 2002 PPL raised the Boroughs' rates for wholesale electricity pursuant to the contractual pricing formula, while not raising the rates PPL charged as a POLR. Pl. St. of Facts ¶¶ 12, 13. However, these activities are all rate-related, unlike the conspiracy to restrict leases and boycott competitors in *Lower Lake Erie*. 998 F.2d at 1153. The central basis for the antitrust claim related to these activities is that plaintiffs were forced to pay an excessive *rate* for wholesale energy under the combined effect of the FERC-filed Power Supply Agreements and the alleged monopolization of the ICAP market, when compared to the retail electricity rates PPL charged POLR customers under the PUC-filed Joint Petition. In fact, the damages sought by plaintiffs stem from the filed wholesale rates allegedly inflated due to PPL's conduct.[18] As in *Utilimax*, plaintiffs do "not allege any non-rate anticompetitive activity, but simply claim[ ] that PPL exploited its market position by raising its rates." *Utilimax (3d. Cir.)*, 378 F.3d at 308. Because plaintiffs' claims relate directly to filed rates and the interaction between them, not some non-

rate based activity, the non-rate anticompetitive activity exception does not apply to their claims.

Plaintiffs allege other anticompetitive activities that possibly fall within the scope of non-rate based behavior. Plaintiffs claim that PPL provided service to some of the Boroughs "that was of lower quality than that which PPL provided to the retail customers that PPL sought to serve directly." Pl. Br. 34. Plaintiffs also contend that PPL tortiously interfered with the Borough of Olyphant's prospective business relationships with industrial customers within its boundaries by informing those customers before the Power Supply Agreements expired that PPL would not be renewing its contract with Olyphant. *Id.*

Though these activities are sufficiently non-rate based to not be barred by the filed rate doctrine, plaintiffs have failed to advance sufficient evidence to support their claims.[19] The Power Supply Agreements, Settlement Agreement, and report of the Boroughs' expert Whitfield Russell do not provide sufficient evidence from which a reasonable jury could find that PPL provided lower quality service to the

---

18. Plaintiffs argue that "the need to prove hypothetical rates lower than those that would have been charged in the absence of market manipulation and the acceptability of those rates to FERC, and the need to overcome the problem of speculative calculation of damages" does not arise in this case. Pl. Br. 34. However, to resolve plaintiffs' claims the court would be forced to speculate whether, without PPL's alleged anticompetitive conduct in the ICAP market, wholesale electricity rates would have been low enough for the Boroughs to receive offers to sell wholesale electricity at less than the PPL contract price. Such conjecture is necessary, for plaintiffs argue that if a test of the wholesale electricity market had yielded lower rates, plaintiffs would have declined to accept PPL's rate increase in 2001 and 2002, rather than accept it and continue under the Power Supply

Agreement. Pl. Exh. 2, Tab A, Article III; Pl. Exh. 23. Thus, the court would be required to speculate as to FERC-approved market-based rates for wholesale electricity. The filed rate doctrine is intended to prevent such conjecture. *Keogh v. Chicago & N.R. Co.*, 260 U.S. 156, 165, 43 S.Ct. 47, 67 L.Ed. 183 (U.S.1922) (reasoning that the filed rate doctrine is applicable because "damages must be proved by facts from which their existence is logically and legally inferable. They cannot be supplied by conjecture").

19. Allegations of this behavior were raised and rejected by this court in the case directly brought by the Borough of Olyphant. *See Olyphant*, 2004 WL 1091037, at *17, 2004 U.S. Dist. LEXIS 8958, at *54–57, *aff'd*, 153 Fed.Appx. 80 (3d Cir.2005).

Boroughs than to its own retail customers. *See* discussion *infra* Part II, Section A. The only evidence of the alleged "tortious interference" plaintiffs provide is a letter sent to various customers of the Borough of Olyphant. Pl. Exh. 16. However, the letter does not purport to be anything other than an attempt by PPL to "set the record straight" and contains no indication that PPL would not renew its supply contract with Olyphant. Pl. Exh. 16. The letter informs Olyphant's customers that "[t]he generation supply contract between the Borough and PPL ends January 31, 2004, leaving the Borough exposed to competitive market prices, which the Borough may need to pass through to its customers." Pl. Exh. 16. This statement only indicates the end of the current contract. If PPL and the Boroughs had renewed the contract, the two parties would have renegotiated the wholesale electricity rates, which would of course be affected by the energy prices in the wholesale market. The court does not see how the letter is evidence of tortious interference, but even if it did support such a claim, it would only do so on behalf of the Borough of Olyphant,[20] whose customers received the letters, and not the other thirteen plaintiffs. Therefore, plaintiffs have failed to provide sufficient evidence of any non-rate anticompetitive activity.

Finally, plaintiffs obliquely contend that the Energy Policy Act of 1992 added a savings provision that somehow precludes the application of the filed rate doctrine. The provision states that "[s]ections 210, 211, 213, 214, and this section, shall not be construed to modify, impair, or supersede the antitrust laws." 16 U.S.C. § 824k. However, "by its terms this provision only refers to limited sections of the Federal Power Act, notably not including those that establish the rate filing requirements, 16 U.S.C. § 824d, and to which the filed rate doctrine relates." *Town of Norwood v. New England Power Co.*, 202 F.3d 408, 420 (1st Cir.2000). Therefore the savings provision of 16 U.S.C. § 824k(e)(2) does not override the filed rate doctrine.

In sum, plaintiffs' Sherman Act § 2 claims are barred by the filed rate doctrine. Plaintiffs have failed to establish that the competitor exception, non-rate anticompetitive activity exception, or any other pertinent limitation on the filed rate doctrine applies. Therefore, the Boroughs' claims are not saved from the filed rate doctrine and defendants' motion for summary judgment on plaintiffs' Sherman Act § 2 claims will be granted.

### C. Violation of the Clayton Act § 2

Section 2 of the Clayton Act prohibits "discriminat[ion] in price between different purchasers of commodities of like grade and quality ... where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly." 15 U.S.C. § 13(a). Plaintiffs allege that "[d]efendants have maintained discriminatory price differentials between sales to wholesale customers and its direct sales to large retail customers which have in the past, and continue, to substantially lessen competition in violation of Section 2 of the Clayton Act." Compl. ¶ 14. In their response to defendants' motion for summary judgment, plaintiffs clarify their Clayton Act claim. They allege that PPL EnergyPlus sold wholesale power to both the Boroughs and a PPL subsidiary, PPL Electric Utilities, which compete with one another as sellers of electricity to retail customers. Pl. Br. 23–4; Pl. Sur–Reply

---

**20.** The Borough of Olyphant is barred by the doctrine of res judicata from bringing any additional claims or relitigating any claims that were decided in *Olyphant,* 2004 WL 1091037, at *17, 2004 U.S. Dist. LEXIS 8958, at *1. *See* discussion *infra* Part III.

21. The same claim was previously raised by the Borough of Olyphant (a plaintiff in the case at bar) and rejected by the court in *Olyphant,* 2004 WL 1091037, at *8, 2004 U.S. Dist. LEXIS 8958 at *26–35, *aff'd,* 153 Fed.Appx. 80 (3d Cir.2005).

■ Plaintiffs contend that they are in direct competition with PPL Electric Utilities and that any price differential between what PPL EnergyPlus charges an affiliated company and what it charges the Boroughs is price discrimination as provided by Clayton Act § 2, 15 U.S.C. § 13(a). Pl. Sur–Reply 21. Defendants argue that summary judgment should be granted on plaintiffs' claim because it is factually and legally defective.

> The Robinson–Patman Act, which amended the Clayton Act,[21] makes it unlawful for any person engaged in commerce ... to discriminate in price between different purchasers of commodities of like grade and quality ... where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefits of such discrimination, or with customers of either of them.

15 U.S.C. § 13(a). Thus, the statute prohibits a seller from engaging in price discrimination that is likely to result in competitive injury. To prove a price discrimination claim under Clayton Act § 2 involving secondary line injury,[22] a plaintiff must show that at the time the price differential was imposed (1) the disfavored purchaser was engaged in actual competition with the favored purchaser(s), and (2) the favored and disfavored purchasers competed at the same functional level, i.e., all wholesalers or all retailers, and within the same geographic market. *Stelwagon Mfg. Co. v. Tarmac Roofing Sys.,* 63 F.3d 1267, 1271 (3d Cir. 1995)

Plaintiffs' Clayton Act § 2 price discrimination claim is identical to a claim brought in the *Olyphant* case. 2004 WL 1091037, at *8–10, 2004 U.S. Dist. LEXIS 8958 at *26–34. In *Olyphant,* as in this case, the Borough of Olyphant argued that PPL Electric Utilities, a PPL subsidiary, is a "favored purchaser" and the plaintiff-Boroughs are the "disfavored purchasers." *Id.* 2004 WL 1091037, at *10; *see also* Pl. Sur–Reply, 21. However this court rejected the Borough of Olyphant's price discrimination claim, stating that "even if plaintiff could show that PPL charged its subsidiaries and the Borough different prices for the same energy ... the federal courts of appeals have unanimously adopted a per se rule that 'intra corporate transfers'—i.e. a parent corporation's transfer of goods to its wholly-owned subsidiary—cannot form the basis of a Clayton Act § 2 claim." *Id.* (citations omitted).

---

**21.** Plaintiffs phrase their price discrimination claim as a violation of Clayton Act § 2; however, it appears they are bringing a claim under the Robinson–Patman Act, 15 U.S.C. § 13(a).

**22.** Secondary line injury is one of the most common types of price discrimination claims based on the Clayton Act § 2. "Secondary line injury cases are characterized by price discrimination by a seller in sales to competing buyers." *J.F. Feeser, Inc. v. Serv–A–Portion, Inc.,* 909 F.2d 1524, 1526 (3d Cir.1990). In other words, secondary line injury results from a seller charging different prices to two purchasers who are in competition with one another. In contrast, primary line injury cases involve injuries incurred by a direct competitor of the allegedly discriminating seller. *See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 220, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993). Plaintiffs state they are asserting a secondary line injury. Pl. Br. 23.

The court adopted the First Circuit's conclusion in *Caribe BMW, Inc. V. BMW,* 19 F.3d 745, 749–51 (1st Cir.1994), based significantly upon the Supreme Court's reasoning in *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), that for the purposes of a Clayton Act § 2, a parent company and its wholly-owned subsidiary are a single entity, and there is no "sale" that could reflect price discrimination because a single entity cannot sell to itself. Because PPL Electric Utilities is a wholly owned subsidiary of PPL Inc., there was no sale of electricity between them and the parent company. *Olyphant,* 2004 WL 1091037, at *12, 2004 U.S. Dist. LEXIS 8958 at *34, *aff'd,* 153 Fed.Appx. 80 (3d Cir.2005).

Plaintiffs assert and the evidence provided establishes that the wholesale electricity sales at issue were not from a parent company to a subsidiary, but from one subsidiary (PPL EnergyPlus) of a parent company (PPL Corporation) to another direct subsidiary (PPL Electric Utilities). Pl. Br. 24; *see also* Pl. Exh. 8, p. 2, 12 (FERC-filed sales agreement between PPL EnergyPlus and PPL Electric Utilities; both companies listing the same mailing address); Pl Exh. 9, (PPL Corporation's Form 10–K for 2001 lists both companies as subsidiaries); PPL Corporation's organizational chart, *available at* http://www.pplweb.com/abo ut/organization + chart/who + we + are.htm (last visited Apr. 4, 2006). Plaintiffs assert that because the electricity sale was a sister-to-sister transaction between PPL affiliates, the reasoning in *Olyphant* and *Caribe* does not apply to bar their Clayton Act § 2 claim. Pl. Br. 24. Additionally, plaintiffs assert that FERC and PJM rules required PPL to erect an ethical wall between its two subsidiaries. *Id.* Defendants argue that *Copperweld* bars a Robinson–Patman Act claim regarding a sale between two affiliated companies and that electricity is not a "commodity" within the meaning of the Act. Def. Br. 32–35.

The question is whether a "sale" of electricity between sister affiliates should be viewed as an 'intra-corporate transfer' of a single entity that is not subject to antitrust liability, or as a sale between two separate entities, which can form the basis of an antitrust claim. In *Copperweld,* the Supreme Court established that a parent corporation and its wholly owned subsidiary are legally incapable of conspiring with each other under § 1 of the Sherman Act. 467 U.S. at 771, 104 S.Ct. 2731. Although the Supreme Court limited its holding to the case of a parent and wholly owned subsidiary, it nonetheless encouraged lower courts to analyze whether affiliated corporate entities have a complete unity of interest rather than focus on mere corporate form:

> The intra-enterprise conspiracy doctrine looks to the form of an enterprise's structure and ignores the reality. Antitrust liability should not depend on whether a corporate subunit is organized as an unincorporated division or a wholly owned subsidiary. A corporation has complete power to maintain a wholly owned subsidiary in either form. The economic, legal, or other considerations that lead corporate management to choose one structure over the other are not relevant to whether the enterprise's conduct seriously threatens competition.

*Id.* at 772–73, 104 S.Ct. 2731 (footnote omitted).

Applying the Supreme Court's reasoning in *Copperweld,* the Fourth, Fifth, and Sixth Circuits have addressed the question of antitrust liability between sister affiliates and concluded "that two subsidiaries wholly owned by the same parent corporation are legally incapable of conspiring

with one another for purposes of § 1 of the Sherman Act." *Advanced Health–Care Servs. v. Radford Community Hosp.*, 910 F.2d 139, 146 (4th Cir.1990); *See Directory Sales Management Corp. v. Ohio Bell Tel. Co.*, 833 F.2d 606, 611 (6th Cir.1987) (*"Copperweld* precludes a finding that two wholly-owned sibling corporations can combine" in violation of § 1); *Hood v. Tenneco Texas Life Ins. Co.*, 739 F.2d 1012, 1015 (5th Cir.1984) (if two siblings cannot conspire with their parent in violation of § 1, they cannot conspire with each other); *Century Oil Tool v. Production Specialties*, 737 F.2d 1316, 1317 (5th Cir.1984) (finding no relevant difference between a subsidiary wholly owned by another corporation and two subsidiaries wholly owned by a third corporation).

The reasoning behind these decisions, although not binding, is convincing. In *Century Oil Tool* the Fifth Circuit observed, "[g]iven *Copperweld*, we see no relevant difference between a corporation wholly owned by another corporation [and] two corporations wholly owned by a third corporation" such that a contract between the two affiliated corporations "does not join formerly distinct economic units" because the affiliates already functioned as a single entity. *Century Oil Tool*, 737 F.2d at 1317. The Third Circuit has also extended the *Copperweld* doctrine beyond the parent-wholly owned subsidiary situation, holding that multiple generations of wholly owned subsidiaries qualify as "one economic unit, incapable of an antitrust conspiracy under *Copperweld.*" *Siegel Transfer v. Carrier Express*, 54 F.3d 1125, 1133 (3d Cir.1995).

Additionally, a number of courts of appeals have construed the *Copperweld* holding to bar claims that a transfer between a parent corporation and an affiliated firm results in a Clayton Act § 2 sale between them. *See Caribe BMW v. BMW*, 19 F.3d 745, 750–51 (1st Cir.1994) (applying *Copperweld*'s reasoning to bar a Robinson–Patman claim); *See also Russ' Kwik Car Wash v. Marathon Petroleum Co.*, 772 F.2d 214, 221 (6th Cir.1985) ("the parent and subsidiary are a single economic unit. The Robinson–Patman Act is not concerned with transfers between them"); *City of Mount Pleasant, Iowa v. Assoc. Elec. Co–Op. Inc.*, 838 F.2d 268, 278–79 (8th Cir.1988) (adopting a *Copperweld*-inspired rule that the Robinson–Patman Act did not apply to sales between the electricity utility company and retail distribution electric cooperatives, where the cooperatives jointly owned the utility); *but see Zoslaw v. MCA Distributing Corp.*, 693 F.2d 870 (9th Cir.1982), cert. denied, 460 U.S. 1085, 103 S.Ct. 1777, 76 L.Ed.2d 349 (1983) (in a case decided prior to *Copperweld*, finding that transactions between parents and subsidiaries are not immune to Robinson–Patman Act claims). As then-Judge (now Justice) Breyer stated on behalf of the First Circuit in *Caribe BMW*, "we find nothing special in the Robinson–Patman Act context that militates against *Copperweld's* reasoning or result." *Caribe BMW*, 19 F.3d at 750. Thus, although the Third Circuit has not spoken directly on this issue, a logical extension of the *Copperweld* doctrine is that two subsidiaries wholly owned by the same parent are legally incapable of selling and buying from one another for purposes of Clayton Act § 2.

 It is undisputed that PPL Corporation is the parent company to both PPL EnergyPlus and PPL Electric Utilities, such that both companies are subject to PPL Corporation's common control. As such, PPL Corporation, PPL EnergyPlus, and PPL Electric are a single entity and any "sale" between them is an intra-corporate transfer that does not give rise to antitrust liability. Plaintiffs themselves

assert "[t]he evidence establishes that it was PPL and its subsidiaries, PPL EnergyPlus and PPL Electric Utilities, *acting as a single company,*" when the alleged "sale" of power took place, in violation of the Clayton Act § 2. Pl. St. of Facts ¶ 18. These companies had "a unity of purpose or a common design" and are incapable of antitrust conspiracy under *Copperweld.* 467 U.S. at 771, 104 S.Ct. 2731; *See Advanced Health–Care Services, Inc. v. Radford Community Hosp.,* 910 F.2d 139, 146 (4th Cir.1990). Thus, the electricity sales between PPL EnergyPlus and PPL Electric may not form the basis of a Clayton Act § 2 price discrimination claim.

Plaintiffs also argue that even if PPL Corporation, PPL EnergyPlus and PPL Electric Utilities are viewed as a single entity, FERC and PJM rules required PPL to erect an ethical wall between its two subsidiaries. FERC provides standards of conduct to prevent employees of a public utility or any of its affiliates engaged in marketing divisions from obtaining information from the employees in the electricity transmission division. *See* 18 C.F.R. Part 358[23] (Standards of Conduct).

Though these standards of conduct prohibit the sharing of transmission information among affiliated companies, they do not prevent the affiliated companies from selling or transferring electricity to one another. The standards of conduct do not affect the underlying reasoning in *Copperweld* and *Century Oil Tool* that wholly owned subsidiaries and parent corporation together form a single economic entity so that there is no "purchase" between PPL EnergyPlus and PPL Electric Utilities that violates the antitrust laws. *Copperweld,* 467 U.S. at 772, 104 S.Ct. 2731; *Century Oil Tool,* 737 F.2d at 1317; *See Siegel Transfer, Inc. v. Carrier Express, Inc.,* 54 F.3d 1125 (3d Cir.1995) (finding that the economic substance of a corporate relationship is more important than the particular formal legal structure). Defendants' motion for summary judgment as to plaintiffs' Clayton Act, § 2 claim will be granted.[24]

## II. Defendants' Motion for Summary Judgment on Plaintiffs' Claims for Breach of Contract

Count II of the Amended Complaint alleges that defendants have breached the

---

**23.** Plaintiffs support their argument citing FERC Order No. 889 and 889A, which add 18 C.F.R. § 37.4, pertaining to standards of conduct for the energy industry. 61 Fed.Reg. 21737 (May 10, 1996) (implementing Part 37 to Code of Federal Regulations); 62 Fed.Reg. 12484 (May 13, 1997) (revising rules regarding standards of conduct). However, plaintiffs fail to mention that 18 C.F.R. § 37.4 was repealed by FERC on February 9, 2004 and replaced with 18 C.F.R. Part 358. *See* 68 Fed.Reg. 69134.

**24.** Because I conclude that intra-entity transfers between two wholly owned subsidiaries of the same parent corporation do not amount to a sale under Clayton Act § 2, I do not address whether electricity is a commodity for Robinson–Patman purposes. The Third Circuit has yet to rule on this issue, though other courts have gone both ways. *Compare, Borough of Ellwood City v. Pennsylvania Pow-*

*er Co.,* 570 F.Supp. 553, 561 (W.D.Pa.1983), *City of Kirkwood v. Union Elec. Co.,* 671 F.2d 1173, 1181–82 (8th Cir.1982) (finding electricity is a commodity for because it "can be felt, if not touched. It is produced, sold, stored in small quantities, transmitted, and distributed in discrete quantities"), *Cablevision v. Pearl River Valley Water Supply Dist.,* 692 F.Supp. 691, 693 (S.D.Miss.1988) (remarking "most of the courts which have considered the issue have concluded that electricity is a commodity subject to the [Robinson–Patman] Act") *with City of Newark v. Delmarva Power & Light Co.,* 467 F.Supp. 763, 774 (D.Del.1979) (finding that the term "commodity" in the Robinson–Patman Act was not intended to encompass electric power), *City of Groton v. Connecticut Light & Power Co.,* 497 F.Supp. 1040, 1052 n. 14 (D.Conn.1980), *aff'd in part and rev'd on other grounds,* 662 F.2d 921 (2d Cir.1981).

FERC approved Settlement Agreement dated January 29, 1998 between PPL and the Boroughs and the corresponding five-year Power Supply Agreements between PPL and each individual borough. Compl. ¶ 20. Plaintiffs' specific claims are that defendants breached the Agreements [25] in two ways:

(21) . . . by making it known through such means as communications with one of the Plaintiffs, communications with third parties, and filings with the [FERC], that if Plaintiffs seek to resell wholesale power under these federally approved agreements to any customers (I) who are located within their respective Boroughs and who are currently served by Defendants, or (ii) to whom Plaintiffs in competition with Defendants seek to provide service within any of the Boroughs, that the Boroughs would be required to pay Defendants an additional stranded cost charge, or the Boroughs would be required to collect and remit such costs.

(22) . . . by contending that the firm power supply that Defendants deliver to some of the Plaintiffs for service to their customers located within the Boroughs can be of a lower quality than that which Defendants would provide to the retail customers Defendants seek to directly serve.

Amended Compl. ¶ 21, Compl. ¶ 22. Plaintiffs' claims are an artful repackaging of the breach of contract claims this court dismissed in *Olyphant*. 2004 WL 1091037, at *17, 2004 U.S. Dist. LEXIS 8958 at *48 (granting summary judgment for PPL on the Borough of Olyphant's claims that PPL breached the Settlement and Power Supply Agreements with regard to stranded cost charges or the firm power supply), *aff'd*, 153 Fed.Appx. 80 (3d Cir.2005).

To state a claim for breach of contract, plaintiffs must show that (1) a contract existed; (2) there was a breach of a duty imposed by the contract; and (3) damages resulting from the breach. *Cooper v. Broadspire Servs., Inc.*, 2005 WL 1712390, at *3, 2005 U.S. Dist. LEXIS 14752, at *6 (E.D.Pa. Jul. 20, 2005). The parties agree that the Settlement Agreement and the related Power Supply Agreements, signed by PPL and the Boroughs, are binding contracts. Pl. Exh. 2, Tabs A and B. However the parties disagree on whether PPL has breached these Agreements.

## A. Firm Power Supply

Plaintiffs claim that defendants have breached the contractual requirement in the Settlement and Power Supply Agreements to supply the Boroughs with "firm power." Pl. Br. 37; Pl. Exh. 2, Tab A, Article 3.1 ("The new power supply agreements between PP & L and the Boroughs

---

25. Plaintiffs argue that the 1998 Settlement Agreement and the Power Supply Agreements are enforceable under both Section 317 of the Federal Power Act, 16 U.S.C. § 825p, and under Pennsylvania state contract law. Pl. Br. 35. Defendants argue that plaintiffs have not explained why asserting their claims under 16 U.S.C. § 825p or as state law breach of contract claims should change this court's analysis. Def. Br. 35, n. 43. However, both plaintiffs and defendants have confused the presence of jurisdiction with the basis of the cause of action. Section 317 of the Federal Power Act is a jurisdictional provision, providing federal district courts with the power

to hear cases alleging violations of FERC orders. 16 U.S.C. § 825p. This jurisdictional grant reinforces the general jurisdictional provisions governing federal district courts. *Montana–Dakota Utils. Co. v. Northwestern Pub. Serv. Co.*, 341 U.S. 246, 249, 71 S.Ct. 692, 95 L.Ed. 912 (1951). The gravamen of the plaintiffs' claim in Count II is a breach of contract claim, which is enforceable under Pennsylvania state contract law. This court has federal question jurisdiction over the antitrust claims in Count I pursuant to 28 U.S.C. § 1331; therefore, jurisdiction over Count II's breach of contract claim is proper under 28 U.S.C. § 1367 or 16 U.S.C. § 825p.

shall be for their firm power requirements (capacity and energy) for a term of five years"). Currently, some of the plaintiffs receive a single-line electricity supply from PPL.[26] Plaintiffs argue that the "firm power" obligation in the Agreements required PPL to construct a second transmission line to supply electricity to the Boroughs which had a single supply line, and that PPL has breached this obligation. Pl. Br. 37.

As in *Olyphant*, this court fails to see how the obligation in the Settlement and Power Supply Agreements to supply "firm power" imposed a duty to construct a second electricity supply line to the Boroughs. 2004 WL 1091037, at *17, 2004 U.S. Dist. LEXIS 8958, at *54–56. Plaintiffs point to no terms in the Agreements which would require such an addition at PPL's expense and the term "firm power" is not defined in the Settlement or Power Supply Agreements. Pl. Exh. 2, Tabs A & B. Rather plaintiffs believe that the definition of "firm power" includes the obligation to build a second supply line.

Plaintiffs argue that because a separate, completely unrelated, contract between PPL EnergyPlus and PPL Electric Utilities refers to operational guidelines established by the North American Electric Reliability Council ("NERC"), NERC guidelines should also apply to the plaintiffs' agreements with PPL. Pl. St. of Facts ¶ 22, Pl. Exh. 2, Tab B. Plaintiffs believe that "firm power," as used in the Settlement Agreement, should be defined to have the same meaning as "interconnections with adjacent utilities," from the NERC guidelines, which provide:

b. Reliance on a single path—There must be sufficient redundancy of transmission lines such that no single transmission path will be depended upon to carry a disproportionate share of power transmitted within or between utilities.

Def. Exh. 13. Therefore, plaintiffs believe the Settlement and Power Supply Agreements obliged PPL to supply the Boroughs with two transmission lines. Pl. Br. 37.

This court does not see a conceivable basis for the plaintiffs' argument. First, the Settlement and Power Supply Agreements do not incorporate NERC guidelines, nor do they refer to the sales contract between PPL EnergyPlus and PPL Electric Utilities. Pl. Exh. 2, Tabs A & B. The Boroughs are not parties to the sales contract between PPL EnergyPlus and PPL Electric Utilities, thus the plaintiffs have no standing to sue over an alleged breach of that contract. Pl. Exh. 8. Plaintiffs also lack standing to sue as third-party beneficiaries to the sales contract, because the contract between the two PPL affiliates does not express any intention to benefit the Boroughs. *See Blue Mt. Mushroom Co. v. Monterey Mushroom*, 246 F.Supp.2d 394, 401 (E.D.Pa.2002) (finding that for a third party to become an "intended beneficiary" so that it would have standing to recover on a contract, the parties to the contract must so intend and must express the intention specifically in the contract, unless extremely compelling circumstances are shown). Thus, there is no evidence that the Settlement and Power Supply Agreements obligated defendants to abide by NERC guidelines in their relations with the plaintiffs.

**26.** Plaintiffs admit that the Boroughs of Kutztown, Lansdale, Quakertown, and Schuylkill Haven have a two-line power supply, while the other Boroughs have a single-line. Pl. Exh. 4, Interrogatory # 10. Plaintiffs and defendants disagree on whether the Borough of Blakely has one or two supply lines. Pl. Sur. Reply to Def. St. of Facts, ¶ B–17; Def. Br. 35, n. 44.

Additionally, plaintiffs fail to explain why they believe that "firm power" and the portion of the NERC guidelines referring to "interconnections with adjacent utilities" are synonymous.[27] The excerpt plaintiffs quote from NERC's guidelines does not mention the term "firm power." Def. Exh. 13. Firm power is power that is "intended to be available at all times during the period covered by a commitment, even under adverse conditions." Edison Electric Institute, GLOSSARY OF ELECTRIC UTILITY TERMS 50 (1995); *see also Aluminum Co. of America v. Central Lincoln Peoples' Utility Dist.*, 467 U.S. 380, 383, 104 S.Ct. 2472, 81 L.Ed.2d 301 (1984) (" 'Firm power' is energy that [an energy producer] expects to produce under predictable streamflow conditions"), *Borough of Lansdale v. Philadelphia Electric Co.*, 692 F.2d 307, 310 n. 3 (3d Cir.1982) (defining "firm electric power" as "power which the consumer is assured will be available on demand"); *Olyphant*, 2004 WL 1091037, at *16, 2004 U.S. Dist. LEXIS 8958, at *54–55. In fact, the NERC guidelines define a "firm purchase" of electricity as one where the seller keeps electricity

reserves on hand to ensure its availability; it "differs from an interruptible purchase that the seller can curtail when it lacks the generating capability to provide for the sale." Def. Exh. 13. Therefore, no reasonable jury could find that "firm power" means power carried over two transmission lines.

■ Thus the question becomes whether defendants breached their duty in the Settlement and Power Supply Agreements to supply "firm power" by failing to keep electricity available to the Boroughs. In an alternative argument that defendants breached the firm power requirements, plaintiffs allege that even under the definition of "firm power" provided in *Olyphant*, there is an issue of fact regarding PPL's breach of the duty to provide firm power. The factual issue relates to whether the outages suffered by the Boroughs were weather related and thus beyond the control of PPL[28] or whether PPL "interrupted" the supply of power to the Boroughs. Pl. Sur–Reply to St. of Facts., ¶ 22, p. 45. In support of their argument, plaintiffs

**27.** Plaintiffs argue that the term "firm power requirements" is ambiguous, thus it should be left to a jury to review extrinsic evidence to determine its meaning. Pl. Sur–Reply, 37. However,

> [i]t is the role of the judge to consider the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning. The trial judge must then determine if a full evidentiary hearing is warranted. If *a reasonable alternative interpretation* is suggested, even though it may be alien to the judge's linguistic experience, objective evidence in support of that interpretation should be considered by the fact finder.

*Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1011 (3d Cir.1980) (emphasis added). Because this court finds plaintiffs' suggestion that "firm power" requires the installation of a second transmission line is not a reasonable alternative inter-

pretation, there is no need for the evidence to be reviewed by a jury.

**28.** Plaintiffs also argue that "had there been dual lines, only one might have been knocked out by severe weather and there might have been no outage in the first place," thus establishing that a second transmission line is required under the firm power obligation. Pl. Sur–Reply to St. of Facts., ¶ 22, p. 45. This argument is a nonstarter. If the court were to accept plaintiffs' logic, PPL might be required to install three or four transmission lines because each additional transmission line would make the Boroughs less prone to weather related outages. However, the possibility of a weather related outage does not impose a contractual obligation upon the defendants to install a second transmission line. Plaintiffs provide no legal support to show that two line service is necessary to meet the "firm power" requirement.

supply the depositions of some of the Boroughs regarding their electricity outages. Pl. Exh. 18.

The depositions provide mixed support for the plaintiffs' position. First, plaintiffs have failed to supply any evidence that the Boroughs of Lansdale, Kutztown, Quakertown, and Schuylkill Haven have suffered any electricity outages. The Boroughs of Duncannon and Mifflinburg do not complain of any power outages caused by PPL and describe the power PPL transmits to the boroughs as "reliable" and "pretty good." Pl. Exh. 18 (Deposition of Terry Brackbill, Duncannon, p. 82; Deposition of Margaret Metzger, Mifflinburg, p. 37). The representative of the Borough of Watsontown, when asked to describe the reliability of the power PPL delivers to the borough, stated "we have very few outages." Pl. Exh. 18 (Deposition of Paul Kreckel, Watsontown, p. 47–48).

Of the plaintiffs that do complain of power outages in their depositions, the Boroughs differ in the causes of their outages. The representatives of the Boroughs of Blakely, Olyphant, and Weatherly stated that most, if not all, of their outages were weather related. Pl. Exh. 18 (Deposition of Donald O'Boyle, Blakely, p. 85–89; 93–4) (complaining of three outages: two were weather related and the cause of the other was not ascertained); (Deposition of Donald O'Boyle, p. 31–32) (claiming that he couldn't remember any outages in PPL's power supply to the borough; all outages to Olyphant's customers were local in nature, due to thunder and lightning storms); (Deposition of Harold Pudliner, Jr., Weatherly, p. 51–52) (in the past year Weatherly had five power outages, all storm related which did not affect the entire borough). The representatives of the Boroughs of Hatfield and Lehighton both stated that their electricity outages were due to site-specific concerns, unrelat-

ed to PPL's power supply to the boroughs. Pl. Exh. 18 (Deposition of David Paulsen, Hatfield, p. 47–48) (outages were related to "specific site concerns, transformers going out, individual lines having problems, items like that."); (Deposition of John Hanosek, Leighton, p. 73–4) (complaining of two outages; one due to a squirrel and the other outage "could have been an accident, somebody hit a pole"). Though the Borough of St. Clair asserts that "the majority of outages are from PPL when we have a problem," the St. Clair borough representative testified that there were only two outages within the past year. Pl. Exh. 18 (Deposition of Roland Price, St. Clair, p. 67–8). One of these outages was due to Hurricane Isabel; the borough representative could not remember the cause of the other outage. *Id.*

Based on these depositions, a reasonable fact finder could not conclude that PPL failed to meet the firm power requirements for the Boroughs of Lansdale, Blakely, Duncannon, Hatfield, Kutztown, Lehighton, Mifflinburg, Olyphant, Quakertown, Schuylkill Haven, St. Clair, Watsontown, and Weatherly. There is no evidence that the outages suffered by these boroughs were caused by PPL. These boroughs either do not complain of outages or attribute the outages to weather related or other causes that were beyond PPL's control. These types of outages are not "interruptions" by PPL and therefore they do not serve as evidence that PPL has ever interrupted these boroughs' service in breach of the firm power requirement. Thus, defendants' motion for summary judgment on this claim with regard to the Boroughs of Lansdale, Blakely, Duncannon, Hatfield, Kutztown, Lehighton, Mifflinburg, Olyphant, Quakertown, Schuylkill Haven, Watsontown, and Weatherly will be granted.

 The deposition given by the representative of the Borough of Catawissa does provide "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). Janet Erb, on behalf of the Borough of Catawissa, stated that with regard to Catawissa's power outages, they "were not the borough's fault. In any one of the instances, it was directly traceable back to PP & L." Pl. Exh. 18 (Deposition of Janet Erb, Catawissa, p. 160). She claimed various instances of breach of the firm power requirement, including:

-[I]n the year 2002, on Christmas day, we were without power for over 15 hours. The secondary line didn't come up....

-On numerous occasions, even as little as last week, the secondary line was down, firm power was interrupted again. It was violated in this respect. We were out for an hour and a half....

-The secondary line comes in, and it requires a technician to manually come out and switch to the second line. Why would it take 15 hours, or an hour and a half? If the secondary line were being maintained, why did it take 15 hours?

*Id.* at p. 157–58. She also testified to an outage where she spoke to a Mr. Johnson at PPL to discover why there was an outage and the second line wasn't coming up. *Id.* at 175. According to Erb, Johnson stated there was an "oil circuit reclosure problem." *Id.* She states that "[a]ll of the businesses that are located in Catawissa Borough complain about the outages through phone calls and verbally even at our meetings." *Id.* at 162. However, Erb also testified that three outages were weather related, one was due to a balloon drifting into a substation, and ten were

"momentary outages." *Id.* (Deposition of Janet Erb, Catawissa, p. 188–199). Because the Borough of Catawissa provides evidence that creates a genuine issue of material fact regarding whether PPL met its firm power requirements, summary judgment on this claim with regard to this plaintiff will be denied.

### B. Retail Stranded Costs

The Settlement Agreement provides that "PP & L will not seek any stranded cost recovery or exit fee against any of the Parties to this Settlement Agreement, and hereby waives any present or future rights to any such claims."[29] Pl. Exh. 2, Tab A, Article 2.6. In the complaint, plaintiffs claim that PPL breached the Settlement Agreement by informing the Boroughs and third parties that if plaintiffs sought to resell wholesale power to any customers located within their respective boroughs who are currently served by defendants or to whom plaintiffs seek to provide service, the Boroughs would be required to pay defendants an additional stranded cost charge or the Boroughs would be required to collect and remit such costs. Amended Compl. ¶ 21. This claim was raised in *Olyphant* and dismissed because the only evidence the plaintiff provided, a letter sent by PPL to certain customers located within the Borough of Olyphant, did not support this allegation. 2004 WL 1091037, at *17, 2004 U.S. Dist. LEXIS 8958, at *50–53, *aff'd*, 153 Fed.Appx. 80 (3d Cir. 2005).

To survive summary judgment, plaintiffs must show that defendants breached a contractual obligation prohibiting PPL from . requiring the Boroughs to pay a stranded cost charge or to collect and re-

---

**29.** Article 6.2 of the Settlement Agreement contains very similar language to Article 2.6. "Based on the terms and conditions of this Settlement Agreement, PP & L will not seek, and hereby waives the right to seek, any stranded cost recovery or exit fee against any of the parties to this Settlement Agreement." Pl. Exh. 2, Tab A, Article 6.2.2

mit such a charge from current PPL customers located within the Boroughs or new customers to whom the plaintiffs seek to sell energy. Because the court concludes that there is insufficient evidence to raise a question of fact regarding such a contractual obligation, defendants' motion for summary judgment will be granted.

### 1. Collateral Estoppel and Issues Adjudicated by FERC and PUC

Defendants contend that they are entitled to summary judgment on all claims dependent on factual or legal issues decided in the defendants' favor in *PPL Elec. Utilities Corp.*, 101 F.E.R.C. ¶ 61,370 (2002) *aff'd, Borough of Olyphant v. FERC*, 114 Fed.Appx. 2 (D.C.Cir.2004) [hereinafter *"FERC proceeding"*] or in *In re PPL Elec. Util. Corp.*, 2003 WL 23338629, at *4–6 (Pa.Pub.Util.Comm., Dec. 18, 2003), *aff'd, Borough of Olyphant v. Pa. PUC*, 861 A.2d 377 (Pa. Commw.Ct.2004) [hereinafter *"PUC proceeding"*]. These administrative agency proceedings both specifically addressed PPL's ability to collect stranded costs from its retail customers. *See FERC proceeding*, 101 F.E.R.C. at ¶ 62,545 (clarifying that the Settlement Agreement applies only to wholesale stranded costs, not retail stranded costs); *PUC proceeding*, 2003 WL 23338629, at (finding that PPL's retail energy customers are required to pay retail stranded costs under Pennsylvania law). Defendants believe that all of the plaintiffs, not just the Borough of Olyphant, the proponent of the FERC and PUC proceedings, are bound by the agency decisions under the doctrine of collateral estoppel.

Under the doctrine of collateral estoppel (also called issue preclusion), "once a court has decided an issue of fact or law necessary to the court's judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *San Remo Hotel, L.P. v. City & County of San Francisco*, 545 U.S. 323, n. 16, 125 S.Ct. 2491, 2501, n. 16, 162 L.Ed.2d 315 (2005). Issue preclusion applies to issues that were litigated and necessary to the outcome of the prior case and a stranger to the first action may invoke issue preclusion against a party to the first action. 18 Moore's Federal Practice § 131.13 (3d ed.2005). Here, defendants argue that all plaintiffs, not just the Borough of Olyphant, are barred from relitigating issues decided in the FERC and PUC proceedings that underlie the breach of contract claim.

■■■ For issue preclusion, or collateral estoppel, to apply, defendants must show an issue of fact or law that was actually and necessarily determined by a court of competent jurisdiction and a subsequent suit involving a party (or a privy) to the prior litigation, even if based on a different cause of action. *Montana v. United States*, 440 U.S. 147, 153, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979) ("[A] right, question, or fact distinctly put in issue and directly determined by a court of competent jurisdiction ... cannot be disputed in a subsequent suit between the same parties or their privies") (citations omitted). Plaintiffs and defendants agree an administrative agency may serve as a "court of competent jurisdiction," so that issues of fact determined in a prior administrative proceeding may have preclusive effect. *United States v. Utah Constr. and Mining Co.*, 384 U.S. 394, 422, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966).

Plaintiffs claim that "neither FERC nor PUC decided the stranded-cost issue presented in the case at bar." Pl. Br. 44–45. However, the issues raised and decided in the FERC proceeding lie at the core of plaintiffs' breach of contract claim regarding the alleged duty not to charge former

**300**

or current PPL retail customers stranded costs. For plaintiffs to prove the breach of contract claim they assert regarding retail stranded costs, they must show that defendants were under a contractual duty imposed by the Settlement Agreement not to charge retail customers for the stranded costs, and that such a duty was breached. FERC held that the Settlement Agreement, while addressing PPL's rights to recover *wholesale* stranded costs from the parties to that agreement, "does not address—and thus would not limit or preclude—PPL's ability to recover *retail* stranded costs from its existing retail customers." *FERC proceeding* at 101 F.E.R.C. ¶ 61,370 at ¶ 62,546 (emphasis added). Thus FERC specifically found that one of the elements of plaintiffs' breach of contract claim, that PPL had an obligation under the Settlement Agreement not to charge its retail customers for retail stranded costs, did not exist.

 The issues in the PUC proceeding, though similar, are not identical to those raised by the plaintiffs in this case, thus issue preclusion does not apply to the PUC proceeding. The PUC did not address the Settlement Agreement in any way. The Commission found that under Pennsylvania law, and consistent with the PUC's previous orders, any retail customer of PPL located within the Borough of Olyphant, must continue to pay retail stranded costs imposed by the PUC, even if such customers in the future received service from Olyphant instead of PPL. *PUC proceeding*, 2003 WL 23338629, at *4–6. Thus, the issue decided in the PUC proceeding was whether PPL could possibly impose retail stranded costs on its

retail customers under Pennsylvania law; the issue in the instant case is whether PPL contractually agreed not to impose stranded costs that it is legally allowed to impose. Therefore, issue preclusion does not apply to any issues decided in the PUC proceeding.

With regard to the FERC proceeding, for issue preclusion to apply, defendants must also show that this suit involves a party (or a privy) to the prior litigation. The Borough of Olyphant was a party to the FERC proceeding because it filed a timely motion to intervene. *FERC proceeding* at 101 F.E.R.C. at ¶ 62,545 ("the timely, unopposed motions to intervene filed by Olyphant ... serve to make [this entity a party] to this proceeding"). Thus, collateral estoppel prevents Olyphant from relitigating the issues in the FERC proceeding.

 Defendants assert that though only the Borough of Olyphant was a party to the FERC proceeding, the other thirteen plaintiffs should be deemed "privies" of Olyphant. The due process clause prevents the application of issue preclusion to parties who have not had a full and fair opportunity to litigate their claims. *Hardy v. Johns–Manville Sales Corp.*, 681 F.2d 334, 338 (5th Cir.1982). Thus, issue preclusion will only apply when the party against whom the doctrine is invoked was a party or in privity with a party to the prior adjudication. *Board of Trustees of Trucking Employees of New Jersey Welfare Fund, Inc.-Pension Fund v. Centra*, 983 F.2d 495, 505 (3d Cir.1992). Here, the Borough of Olyphant was a party to the FERC proceeding.[30] The "party against

---

**30.** Plaintiffs believe that Olyphant did not have a full and fair opportunity to litigate the issues in the FERC proceedings because there were "disputed issues of fact" and there needed to be "an evidentiary hearing, which nei-

ther agency held." Pl. Br. 45. However, an express finding in a valid judgment is sufficient to satisfy the requirement that the issue be actually litigated; it is irrelevant that the finding was based on very little evidence.

whom the collateral estoppel has been asserted [must] have some fair relationship with the prior litigation relied upon." *Moldovan v. Great Atlantic & Pacific Tea Co.*, 790 F.2d 894, 899, n. 9 (3d Cir.1986), *cert. denied*, 485 U.S. 904, 108 S.Ct. 1074, 99 L.Ed.2d 233 (1988). Courts have typically found privity to exist in three circumstances: (1) where the nonparty has succeeded to, or shares a concurrent right to the party's interest in, property, (2) where the nonparty controlled the prior litigation, and (3) where the party adequately represented the nonparty's interests in the prior proceeding. *See, e.g., Latham v. Wells Fargo Bank, N.A.*, 896 F.2d 979, 983 (5th Cir.1990); 18 Moore's Federal Practice § 132.04[1][b][iv].

The court finds that the thirteen plaintiffs in this action are not in privity with the Borough of Olyphant for the purpose of issue preclusion. Obviously the other boroughs have neither succeeded to nor share a concurrent right to Olyphant's interest. Defendants have provided no evidence that the other boroughs were parties to, involved in, or controlled the FERC proceeding or were even advised of the proceeding. Finally, a determination whether Olyphant adequately represented the interests of the other boroughs in the FERC proceeding would require a factual determination involving a major collateral issue that could not be resolved on summary judgment. Thus, I can not conclude the remaining thirteen plaintiffs had a fair and full opportunity to litigate the issues decided in the FERC proceeding and they are not precluded from litigating those issues in this case.

In sum, because the PUC proceeding did not involve the same issues raised in the case at bar, issue preclusion is not appropriate as to the PUC proceeding. The Borough of Olyphant is precluded from relitigating the issue adjudicated in the FERC proceeding, i.e. the Settlement Agreement prohibits PPL from charging Olyphant wholesale stranded costs, but does not affect the retail cost obligations of PPL's retail customers. The remaining thirteen plaintiffs are not precluded from relitigating this issue.

*2. No Question of Fact Regarding Alleged Obligation Not to Charge Retail Stranded Costs*

■ Plaintiffs have failed, however, to provide sufficient evidence in support of their claim that PPL is contractually obligated not to charge retail stranded costs. Plaintiffs argue that under the terms of the Agreements, PPL could not charge its retail stranded costs to any of the Boroughs' new customers. Pl. Br. 36. Plaintiffs claim that the "contracts expressly committed [PPL] to provide all of the wholesale power requirements for any of the boroughs' customers, new or old, without payment of any stranded costs to PPL." Pl. Br. 39. The Power Supply Agreements state that "[d]uring the term of this Agreement, PP & L shall supply to [each Borough] and [each Borough] shall purchase from PP & L all of [the Borough's] capacity and energy requirements for service to its customers in its service territory." Pl. Exh. 2, Tab B, Art. 3. According to plaintiffs, this section, when read together with the language in the Settlement Agreement where PPL agrees not to collect stranded costs from the Boroughs, results in "an absolute prohibition on *any* stranded cost recovery," so PPL could not have expected to collect stranded costs from the Borough's new customers.

*Grip–Pak, Inc. v. Illinois Tool Works, Inc.*, 694 F.2d 466, 469 (7th Cir.1982) (finding that collateral estoppel will preclude relitigation of an issue, no matter how slight the evidence was on which a determination was made in the first suit on the same issue.)

*Id.* 39–40. Plaintiffs claim that whether the stranded cost is technically "imposed on a borough or its putative retail customer is a distinction without a difference." Pl. Br. 39.

This distinction makes all of the difference in the plaintiffs' breach of contract claim. Such a strained interpretation of the two Agreements is not supported by the express language of the Settlement Agreement, which limits PPL's rights to "seek any stranded cost recovery or exit fee against *any of the Parties* to this Settlement Agreement." Pl. Exh. 2, Tab A, Art. 2.6 (emphasis added). The retail customers were not parties to the Settlement Agreement; therefore, PPL never contractually obligated itself not to charge stranded costs to retail customers. In *Olyphant,* this court agreed with the persuasive [31] reasoning of FERC [32] that the Settlement Agreement only addressed wholesale stranded costs payable by the Boroughs, not the retail stranded cost obligations of retail customers. 2004 WL 1091037, at *17, 2004 U.S. Dist. LEXIS 8958, at *51–52, *see also FERC proceeding,* 101 F.E.R.C. 61,370, 62,544 (2002). FERC stated that "PPL's entitlement to recover retail stranded costs from its existing retail customers" was addressed separately by the PUC in its approval of PPL's restructuring plan in its Joint Petition, which resulted in a final order dated August 27, 1998. 101 F.E.R.C. at 62,546. The Settlement Agreement clearly and unambiguously applies only to wholesale stranded costs, not to retail stranded costs. Any retail stranded cost recovery is governed by Pennsylvania law and the PUC.[33]

Plaintiffs argue that the PUC has no legal authority to require the Boroughs, which purchase wholesale power, to compel their retail customers to pay state stranded costs. Pl. Br. 39. Plaintiffs

---

**31.** The issues decided in FERC proceedings carry persuasive force. *United States v. Mead Corp.,* 533 U.S. 218, 234, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) ("[A]n agency's interpretation may merit some deference whatever its form, given the 'specialized experience and broader investigations and information' available to the agency").

**32.** In 2002, PPL petitioned FERC for a declaratory order concerning the interpretation of the stranded costs provision of the Settlement Agreement. FERC clarified that "[t]he Settlement Agreement, while addressing PPL's rights to recover wholesale stranded costs from the parties to that proceeding, including Olyphant, does not address PPL's rights to recover retail stranded costs from its existing retail customers, who were not parties to the Settlement Agreement." *PPL Electric Utilities Corporation,* 101 F.E.R.C. 61,370, 62,544 (2002). Because the parties to the Settlement Agreement were the Boroughs, and not PPL's retail customers, "the Settlement Agreement does not address—and thus would not limit or preclude—PPL's ability to recover retail stranded costs from its existing retail customers." *Id.* at 62,546.

**33.** FERC has explained the difference between "wholesale stranded cost" and "retail stranded cost" in the following manner:

[A]s the definitions of those terms make clear, it is not the nature of the costs (wholesale vs. retail) that is controlling for purposes of stranded cost recovery under [Order No. 888]. Rather, the controlling factors are the status of the customer (wholesale transmission services customer vs. retail transmission services customer) with whom the costs are associated, and whether the transmission tariffs used by the customer to escape its former power supplier (thus causing the stranded costs to occur) were required by [the FERC] or by a state commission. As a result, "retail stranded costs" refers to stranded costs associated with retail wheeling customers.

Order No. 888, 78 F.E.R.C. P61,220, n. 475 (1997). Since customers who would purchase energy from the Boroughs, as opposed to from PPL directly, would be retail wheeling customers, not wholesale customers, any stranded costs sought to be collected from these customers would be considered retail stranded costs.

claim that Pennsylvania statutes specifically recognize such an exemption and that this exemption was confirmed by the Executive Director of the PUC in a letter to the Borough of Olyphant. *See* 66 Pa. Cons. Stat. § 2805(b); *see also* Pl. Exh. 2, Tab C. However, plaintiffs fail to explain how the PUC's authority to require payment of retail stranded costs is related to their breach of contract claim with respect to the Settlement and Power Supply Agreements. Regardless, the statute and the letter do not support plaintiffs' argument. The Pennsylvania statute plaintiffs rely on does not mention stranded costs; it discusses non-discriminatory access to distribution and transmission lines for EGSs and the necessity of filing a restructuring plan with the PUC prior to using another electric utilities distribution system. 66 Pa. Cons.Stat. § 2805(b). Also, the plaintiffs mischaracterize the letter from Barbara Bruin, the Executive Director of the PUC. The letter states that in the Director's opinion, 66 Pa. Cons.Stat. § 2805(b) supports the Borough of Olyphant's attempt to regain exclusive rights to sell energy to retail customers within a particular area of the Borough, whose energy needs were being served by PPL. Pl. Exh. 2, Tab C. This letter states no opinion on whether, once Olyphant gained the exclusive right to sell energy to these retail customers, PPL would be prohibited from imposing retail stranded costs, thus it does not support plaintiffs' argument. *Id.*

Pennsylvania's Competition Act explicitly provides the PUC with the exclusive jurisdiction to determine matters pertaining to the collection of "intangible transition charges"[34] and specifically, gives the PUC the power to decide whether PPL's

retail customers would have to continue to pay such charges if they switched their purchases of electric services to the Boroughs. 66 Pa.C.S. § 2812(f)(2). The PUC has found, pursuant to the Competition Act, 66 Pa.C.S. § 2812(b)(5) and the Final Order approving the Joint Petition, that PPL is authorized to collect retail stranded costs from its customers located within PPL's certificated territory. *PUC proceeding*, 2003 WL 23338629, at *4–6. The Commission stated that even if retail customers, who were PPL customers on the effective date of the Competition Act, later chose the Boroughs to be their EGS, the Boroughs "would have an obligation to collect and remit on behalf of PPL the [retail stranded costs]." *Id.* at *6. Thus, the appropriate legal authority found that the Boroughs are obligated to collect and remit retail stranded costs of PPL customers who seek to receive service from the Boroughs.

Plaintiffs next argue that even if the contracts did not "expressly commit[ ][PPL] to provide all of the wholesale power requirements for any of the boroughs' customers, new or old, without payment of any stranded costs," the facts are in dispute as to "what the parties intended to be the scope of the prohibition on stranded costs." Pl. Br. 39; Pl. Sur–Reply, 23. Plaintiffs present the affidavit of F. Lee. Mangan, Chairman of the Borough Group, who participated in the negotiation of the Settlement and Power Supply Agreements, in support of their argument. Pl. Exh. 2. Mangan claims that the provision prohibiting the imposition of stranded costs on the Boroughs, plus the provision providing for firm power,

---

**34.** An "intangible transition charge" is the amount authorized to be imposed so an electric utility can recover its stranded costs. *See* 66 Pa.C.S. § 2812(g); *see also Borough of Olyphant v. Pa. Power & Light Co.,* 269

F.Supp.2d 601, 602 (M.D.Pa.2003) (finding that retail "stranded costs" is synonymous with "competitive" and "intangible transition charges")

made it clear that the Boroughs were going to receive their requirements of wholesale power from PPL for any new loads or retail customers obtained by the Boroughs within their boundaries, without payment of any stranded cots. The Boroughs would have never entered the settlement agreement if PPL could charge either the Boroughs or any of their new customers, a stranded cost, contrary to the plain language of the agreements. No such suggestion was never [*sic*] made by PPL during the negotiations

Pl. Exh. 2, ¶ 6. Thus, plaintiffs believe summary judgment is inappropriate because there are factual questions regarding the meaning of certain provisions in the Agreements that can only be resolved by the consideration of other evidence at trial. Pl Br. 40.

 It is well settled in Pennsylvania that absent fraud, accident or mistake, parol evidence as to preliminary negotiations or oral agreements is not admissible "if it adds to, modifies, contradicts or conflicts with the written agreement between the parties." *Daset Mining Corp. v. Industrial Fuels Corp.*, 326 Pa.Super. 14, 473 A.2d 584, 592 (1984), see also *Servomation Mathias Pa., Inc. v. Lancashire Hall, Inc.*, 442 Pa. 602, 276 A.2d 547 (1971). However, where an agreement is ambiguous, parol evidence is admissible "to explain the agreement and resolve ambiguities to ascertain the meaning of the parties." *Id.* citing *Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001 (3d Cir. 1980)

 A term is "ambiguous if it is subject to reasonable alternative interpretations." *Taylor v. Cont'l Group Change*

*in Control Severance Pay Plan*, 933 F.2d 1227, 1232 (3d Cir.1991). "In determining whether a particular clause in a plan document is ambiguous, courts must first look to the plain language of document." *Bill Gray Enters. v. Gourley*, 248 F.3d 206, 218 (3d Cir.2001). If the plain language of the document is clear, there is no ambiguity, thus courts must not look to other evidence. *Id.* citing *Mellon Bank*, 619 F.2d at 1013 ("Our approach does not authorize a trial judge to demote the written word to a reduced status in contract interpretation. Although extrinsic evidence may be considered under proper circumstances, the parties remain bound by the appropriate objective definition of the words they use to express their intent"); see also *Epright v. Environmental Resources Mgmt.*, 81 F.3d 335 (3d Cir.1996) ("it is inappropriate to consider such [extrinsic] evidence when no ambiguity exists"). Only if the plain language in the contract leads to two reasonable alternative interpretations, may a court look to parol evidence to resolve the ambiguity. *Bill Gray Enters.*, 248 F.3d at 218.

The Settlement Agreement provides that "PP & L will not seek any stranded cost recovery or exit fee against *any of the Parties* to this Settlement Agreement." Pl. Exh. 2, Tab A, Article 2.6 (emphasis added). The parties to the agreement are PPL and the Boroughs, who are plaintiffs [35] in this case. It is clear from the plain language of the contract that PPL is prohibited only from charging stranded costs to the Boroughs. The Boroughs' retail customers were not parties to the Settlement Agreement; therefore, PPL never agreed not to seek retail stranded costs from these customers. Plaintiffs' attempt to introduce ambiguity where none

**35.** The Borough of Perkasie is also a party to the Settlement Agreement; however, Perkasie is not a plaintiff in this case.

exists must fail. The court may not look to the substance of the negotiations or the understanding of one of the negotiators when the meaning of the terms of the agreement are this clear. Therefore, because the contract's plain language is clear on its face, the substance of the negotiations leading to the Settlement Agreement are irrelevant.

Plaintiffs additionally argue that the court in *Olyphant* misconstrued PPL's letter to customers of the Borough of Olyphant, and that the letter does support their argument that the Boroughs would be required to pay defendants an additional stranded cost charge. Pl. Br. 38, n. 35. They also claim that deposition testimony given by John Sipics, PPL's President, confirms that "PPL's representations to its existing retail customers that if they took power service from the Boroughs, they would be required to pay PPL a stranded cost, were wrong." Pl. Statement of Facts, ¶ 21; Def. Exh. 14.

First, the letters at issue were sent only to PPL customers within the Borough of Olyphant. Thus even if the letters did support plaintiffs' claims, they could only potentially serve as evidence to support Olyphant's claim, not the other thirteen Boroughs. Sipics, PPL's president, wrote these letters in response to letters sent by Olyphant to PPL "customers announcing its intent to replace PPL Electric Utilities as the electric distribution company serving Mid–Valley Industrial Park." Pl. Exh. 25. The letters state:

> The Borough's letter also notes that under its present contract, stranded costs are precluded. This is true for the Borough's current customers. However, should the Borough take on additional customers that are currently required to pay stranded costs, the Borough will be required to collect and remit such costs.

*Id.* As this court stated in *Olyphant*, "the proposed letter from PPL to Park customers clearly explains that the customers themselves, as opposed to the Borough, would be required to continue paying the retail stranded cost charges currently incurred." 2004 WL 1091037, at *17, 2004 U.S. Dist. LEXIS 8958, at *50, *aff'd*, 153 Fed.Appx. 80 (3d Cir.2005). The court stands by its analysis in *Olyphant*. The letters clearly view Olyphant in the role of a collection agent; the funds themselves would be paid by the retail customers. The letters do not support the existence of a contractual obligation not to charge retail stranded costs, let alone support plaintiffs' argument that this obligation was breached by informing retail customers of the stranded costs charge.

The deposition testimony of Sipics also does not support the Boroughs' claim. In response to a hypothetical question, Sipics stated that if a PPL customer disconnected service and physically relocated into a borough which provided service, PPL would not attempt to "chase" the customer to collect retail stranded costs. Def. Exh. 14. A customer physically moving from one location to another is far different from a borough extending into a new service area and asserting that the customers in that area no longer needed to pay stranded costs. Def. Exh. 14, p. 97–102. Moreover, even if plaintiffs were correct in alleging that Sipic's testimony is contrary to the position he took in the letters he wrote to Olyphant's customers, his testimony does not support a claim for breach of contract, because as discussed *supra*, the Settlement and Power Supply Agreements do not prevent defendants from recovering retail stranded costs from retail customers. Additionally, some of the testimony plaintiffs use to support their argument was in response to deposition questions that called for legal conclusions. Def. Exh. 14, p. 99 ("Well, wherever they go, do they have to pay, continue to pay

the former retail stranded costs?", "So you're then telling me that any of your customers could leave and go to the boroughs and there wouldn't be any stranded costs applicable to them; correct?"). As unsubstantiated legal conclusions,[36] Sipic's responses are not sufficiently probative to enable the plaintiffs to defeat summary judgment. *See, e.g., Maldonado v. Ramirez,* 757 F.2d 48, 51 (3d Cir.1985) ("An affidavit that is essentially conclusory and lacking in specific facts is inadequate to satisfy the movant's burden").

In sum, plaintiffs, other than Olyphant, are not collaterally estopped from relitigating the issue decided before FERC. However, the Settlement Agreement clearly only prohibits PPL from charging stranded costs to the Boroughs and does not restrict PPL's ability to recover retail stranded costs. The Settlement Agreement does not override any retail stranded-cost obligations that PPL's retail customers may have under Pennsylvania law, thus PPL's taking this position with respect to the Settlement Agreement, and communicating it, is not a breach of contract. Plaintiffs have failed to provide evidence that shows there is a genuine issue of material fact with regard to PPL's duties under the contract. Accordingly, defendants' motion for summary judgment on plaintiffs' claim that defendants breached the Settlement Agreement by seeking retail stranded costs from retail customers who might purchase energy from the Boroughs will be granted.

### III. Claims by the Borough of Olyphant are Barred by Res Judicata

 Defendants contend that the doctrine of res judicata prevents one of the plaintiffs, the Borough of Olyphant, from asserting claims that were previously litigated to a conclusion in *Olyphant.* The party asserting the affirmative defense of res judicata bears the burden of showing that it applies. *See* Fed.R.Civ.P. 8(c), *United States v. Athlone Industries, Inc.,* 746 F.2d 977, 983 (3d Cir.1984). Under the doctrine of res judicata, a subsequent suit is barred if there has been (1) a final judgment on the merits of the prior suit (2) on the same claim (3) between the same parties or their privies. *Labelle Processing Co. v. Swarrow,* 72 F.3d 308, 313 (3d Cir.1995). "When a court of competent jurisdiction has entered a final judgment on the merits of a cause of action, the parties to the suit and their privies are thereafter bound 'not only as to every matter which was offered and received to sustain or defeat the claim on demand, but as to any other admissible matter which might have been offered for that purpose.'" *Hubicki v. ACF Industries, Inc.,* 484 F.2d 519, 524 (3d Cir.1973), quoting *Cromwell v. County of Sac,* 94 U.S. 351, 352, 24 L.Ed. 195 (1948).

 The Borough of Olyphant may not proceed as a plaintiff in the claims at issue because the doctrine of res judicata is clearly applicable to the claims Olyphant lost in the prior litigation. The Borough of Olyphant is a plaintiff in the present action and was the plaintiff in *Olyphant;* PP & L, Inc., PPL Corp., PPL Electric Utilities Corp., and PPL Generation, L.L.C. are defendants in the present action and were also defendants in Olyphant.[37] *See,* 2004 WL 1091037, *1, 2004 U.S. Dist. LEXIS

---

**36.** When asked more specific questions regarding whether retail customers are subject to paying stranded costs in the Borough of Olyphant, Sipics recognized his inability to answer such a legal issue and said that he "would have to talk to lawyers" to decide whether stranded costs could be charged. Def. Exh. 14, p. 101–102.

**37.** Defendant PPL Energy Plus, L.L.C, though not a defendant in *Olyphant,* is a wholly-owned subsidiary of PPL, Inc, which was a

8958 at *1. Plaintiffs' Sherman Act § 1, Sherman Act § 2 (as to the alleged price squeeze),[38] Clayton Act § 2, and breach of contract claims, are virtually identical to claims previously made by the Borough of Olyphant in *Olyphant* on which this court granted summary judgment in the defendants' favor. *Id.* Summary judgment is "a final judgment on the merits" for the purposes of res judicata. *Hubicki*, 484 F.2d at 524. The judgment in *Olyphant* was affirmed by the Third Circuit. *Borough of Olyphant v. PPL Corp.*, 153 Fed.Appx. 80 (3d Cir.2005). Consequently, because *Olyphant* decided the same claims between the Borough of Olyphant and the defendants on the merits, the judgment in *Olyphant* is conclusive as to all matters relating to the Borough of Olyphant on the identical claims.

■■■ Olyphant claims that res judicata is inapplicable when new facts emerge "if the plaintiff could not have discovered the facts through the exercise of due diligence at the time of filing of the prior action." Pl. Br. 42. It claims that new evidence, specifically, the facts provided in plaintiffs' answers to Interrogatories 16–19, became available from depositions taken and document requests made in the present case, after the summary judgment ruling in *Olyphant*. Pl. Exh. 4. Newly discovered evidence does not prevent the application of res judicata, "unless the evidence was ei-

ther fraudulently concealed or it could not have been discovered with due diligence." *Haefner v. N. Cornwall Twp.*, 40 Fed. Appx. 656, 658 (3d Cir.2002), *L–TEC Elecs. Corp. v. Cougar Elec. Org., Inc.*, 198 F.3d 85, 88 (2d Cir.1999) (quotations omitted); *see also Guerrero v. Katzen*, 774 F.2d 506, 508 (D.C.Cir.1985).

Assuming that the Borough of Olyphant has made a showing of "new facts," [39] the court finds no support in the record for the application of either exception. Olyphant has made no showing that the defendants actively concealed any of the facts surrounding this case. Olyphant claims to have exercised due diligence because these new facts arose in response to depositions and discovery requests made in the present action. Pl. Sur–Reply, 30. However, nothing prevented the Borough of Olyphant from obtaining this information by making the same requests and taking the same depositions during discovery in *Olyphant*. Olyphant filed its complaint on December 5, 2001. Complaint, *Borough of Olyphant v. PPL*, Civ. No. 01–2308, Dkt. no. 1 (M.D. Pa., filed Dec. 5, 2001). The discovery deadline in *Olyphant* was extended to November 25, 2002. "Order Granting Plaintiff's Motion to Extend Discovery," *Borough of Olyphant v. PPL*, Civ. No. 01–2308, Dkt. no. 58 (M.D. Pa., filed Oct. 11, 2002). When the case was trans-

---

defendant in *Olyphant*. Thus, there is privity between the parties. *Greenberg v. Potomac Health Sys.*, 869 F.Supp. 328, 331 (E.D.Pa. 1994) (finding that a subsidiary company was in privity with its parent company and one of the parent company's officers).

**38.** In *Olyphant*, this court granted summary judgment for the defendants on the Borough of Olyphant's Sherman Act § 2 claim with respect to monopolization of the wholesale power market "without prejudice to the right of plaintiff to pursue this claim in the *Lansdale* action." *Olyphant*, 2004 WL 1091037, at *17, 2004 U.S. Dist. LEXIS 8958, at *48.

Thus, defendants do not argue that the Borough of Olyphant is barred by res judicata from asserting this claim in the case at bar. Def. Br. 44, n. 52.

**39.** Olyphant's alleged "new facts" seem to consist of a regurgitation of legal arguments. Other than the deposition of John F. Sipics, the answers to Interrogatories 16–19 refer to documents and depositions that plaintiffs have not provided in their opposition to summary judgment. Pl. Exh. 4. Thus it is unclear to the court what new facts have come to light that would impact the court's decision now, compared to its decision in *Olyphant*.

ferred to the Eastern District of Pennsylvania, Olyphant did not request additional time for discovery. Olyphant proffers no reason why it could not have found this new evidence with due diligence during the almost one year discovery period in the prior action. Thus, plaintiffs' discovery of additional facts following entry of summary judgment in *Olyphant* does not block the application of res judicata as to Olyphant.

Olyphant next argues that res judicata is not appropriate "if the party against whom the prior judgment was entered did not have a full and fair opportunity to litigate the claim in the prior proceeding." Pl. Br. 43. The Supreme Court has recognized that for res judicata to apply, the judgment must arise from proceedings which satisfy the procedural requirements of the due process clause so that the party had a fair opportunity to litigate. *Kremer v. Chemical Construction Corp.*, 456 U.S. 461, 480–82, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982). Olyphant asserts that the court's decision to deny the Borough of Olyphant's untimely motion for summary judgment on PPL's counterclaims, in the prior action, even though it was based on "new facts" discovered in the case at bar, amounts to a due process violation. However, in considering the Borough of Olyphant's motion for summary judgment, this court stated that

> having a deadline for the filing of dispositive motions of October 10, 2002, the trial in this action having been scheduled for September 7, 2004, the motion not having been filed until August 3, 2004 almost two years after the deadline for the filing of dispositive motions and within approximately one month of the trial date, and the motion being based on the deposition of a witness taken in another action without any explanation of why the deposition could not have been taken in a timely manner in this

action, IT IS HEREBY ORDERED that the motion is DENIED as untimely. The court assumes, however, that the defendants will consider the issues raised in the motion in their evaluation of their counterclaims and in their preparation for the trial on those counterclaims.

Order Denying Plaintiff's Motion for Summary Judgment, *Borough of Olyphant v. PPL*, No. 04–3283, Document # 38 (August 12, 2004). On appeal, Olyphant argued that the district court erred in denying its motion for summary judgment on PPL's counterclaims. *Borough of Olyphant v. PPL Corp.*, 153 Fed.Appx. 80, 82 (3d Cir.2005). But the Third Circuit affirmed the court's decision, stating "[w]e have carefully considered Olyphant's arguments on this appeal and find that they lack merit." *Id.* at 83. Thus, the court fails to see how any constitutional violation arose with regard to this court's decision to deny the Borough of Olyphant's motion for summary judgment given Olyphant's extreme delay and the lack of due diligence.

Lastly, without citing any legal support for this position, Olyphant argues that dismissing the Borough of Olyphant's claims would deny the other boroughs their due process rights, because these boroughs would be unable to use evidence involving Olyphant that also supports their claims. Pl. Br. 44. Plaintiffs must produce evidence to support each claim as it applies to each borough directly. *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 489 (3d Cir. 2000) (finding that multiple plaintiffs must adduce evidence from which it might be inferred that each of them has a claim, though they may produce evidence from which it may be inferred they were harmed as a collective). If any evidence related to the Borough of Olyphant is relevant to the other boroughs' claims, that

evidence is available as to those plaintiffs, whether or not Olyphant is a party to the action. *See* Fed.R.Evid. 402 ("All relevant evidence is admissible"). Thus, barring the Borough of Olyphant's claims based on res judicata will not deprive the other plaintiffs of their due process rights.

In sum, summary judgment is granted in favor of the defendants as to all Sherman Act § 1, Sherman Act § 2 (as to the alleged price squeeze), Clayton Act § 2, and breach of contract claims asserted by the Borough of Olyphant, because these claims are barred by the doctrine of res judicata.

## CONCLUSION

Defendants' motion for summary judgment will be granted in part and denied in part. Plaintiffs have failed to produce evidence in support of most of their claims and much of the evidence actually cited by plaintiffs does not corroborate the contentions plaintiffs purport it supports. For these reasons, defendants' motion for summary judgment will be granted on plaintiffs' claims for violation of the Sherman Act § 1, the Sherman Act § 2, the Clayton Act § 2 and as to plaintiffs' breach of contract claim with regard to retail stranded costs.

With regard to plaintiffs' breach of contract claim in relation to firm power requirements, summary judgment on this claim with regard to the Borough of Catawissa will be denied because Catawissa has provided evidence that creates a genuine issue of material fact regarding whether PPL met its firm power requirements. However, the motion for summary judgment will be granted as to the Boroughs of Lansdale, Blakely, Duncannon, Hatfield, Kutztown, Lehighton, Mifflinburg, Olyphant, Quakertown, Schuylkill Haven, St. Clair, Watsontown, and Weatherly. These boroughs have not provided evidence raising a genuine issue of material fact that the defendants breached the contract.

The Borough of Olyphant is barred by the doctrine of res judicata from asserting claims as to Sherman Act § 1, Sherman Act § 2 (as to the alleged price squeeze), Clayton Act § 2, and breach of contract, because these same claims were already litigated to a conclusion in *Olyphant.* An appropriate order follows.

## *ORDER*

And now, this _____ day of April, 2006, upon consideration of the motions for summary judgment of defendants PP & L, Inc., PPL Electric Utilities Corp., PPL Energy Plus L.L.C. and PPL Generation, L.L.C. (Doc. # 70), the responses in opposition thereto of the plaintiffs, plaintiffs' accompanying statements of facts, defendants' reply memoranda in support of their motions for summary judgment and the accompanying statements of facts, and plaintiffs' sur-reply in further support of their opposition to defendants' motion, it **IS HEREBY ORDERED** that:

1. The motion is **GRANTED** as to all antitrust claims based on Sherman Act § 1, the Sherman Act § 2, and the Clayton Act § 2, and judgment is entered in favor of all defendants and against all plaintiffs on those claims.

2. The motion is **GRANTED** as to the plaintiffs' breach of contract claim regarding retail stranded costs, and judgment is entered in favor of all defendants and against all plaintiffs on this claim.

3. The motion is **GRANTED** as to the plaintiffs' breach of contract claim regarding firm power requirements, brought by the Boroughs of Lansdale, Blakely, Duncannon, Hatfield, Kutztown, Lehighton, Mifflinburg, Olyphant, Quakertown, Schuylkill Haven, Watsontown, and Weatherly, and judgment is entered in

favor of all defendants and the listed plaintiffs on this claim

4. The motion is **DENIED** as to the plaintiffs' breach of contract claim regarding firm power requirements brought by the Borough of Catawissa.

5. The motion is **GRANTED** with regard to the Sherman Act § 1, Sherman Act § 2 (as to the alleged price squeeze), Clayton Act § 2, and breach of contract claims asserted by the Borough of Olyphant that were litigated in *Borough of Olyphant v. PP & L, et. al.*, Civ. No. 03–4023, 2004 WL 1091037, *1, 2004 U.S. Dist. LEXIS 8958, at *1 (E.D.Pa. May 14, 2004), *aff'd* 153 Fed.Appx. 80, 82–83 (3d Cir. 2005).

6. Counsel shall submit their joint or individual proposals for a trial date and the anticipated length of trial to resolve the remaining issues in the action by letter within 20 days of the date of this order.